2016 UT App 87

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KIRK ROBERT GRAY,
Appellant.

Opinion
No. 20140027-CA
Filed April 28, 2016

Third District Court, West Jordan Department
The Honorable Mark S. Kouris
No. 131400643

John B. Plimpton and Joan C. Watt, Attorneys
for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE GREGORY K. ORME concurred. JUDGE J. FREDERIC VOROS JR. concurred, with opinion.

ROTH, Judge:

¶1     Kirk Robert Gray pleaded guilty to four counts of rape of a child, one count of rape, and one count of aggravated sexual abuse of a child. The district court imposed the statutory prison sentences on each count and ordered them to run consecutively. Gray argues that the district court plainly erred when it failed to recognize that the State breached a plea agreement and failed to provide Gray a remedy. Gray also contends that the district court abused its discretion by imposing multiple consecutive sentences. We affirm.

BACKGROUND

¶2     In October 2013, Gray entered into a plea agreement whereby he agreed to plead guilty to six felonies: four counts of rape of a child, *see* Utah Code Ann. § 76-5-402.1(2) (LexisNexis Supp. 2007), one count of rape, *see id*. § 76-5-402(3) (Supp. 2015), and one count of aggravated sexual abuse of a child, *see id*. § 76-5-404.1(4) (Supp. 2003). In exchange, because the offenses occurred over a period of about a decade, the State agreed to designate the dates of some of the offenses so that they would fall under prior statutory sentencing schemes that provided more lenient prison sentences than the current versions of those same statutes.[1] In addition, the State agreed to recommend that the sentences for five of the counts—four counts of rape of a child and one count of rape—run concurrently with each other. However, the State reserved the right to recommend that the sentence for the sixth count—aggravated sexual abuse of a child—run consecutive to the other sentences.

¶3     At the change of plea hearing, defense counsel recited the amended charges, the amended dates entered for those charges, and the potential sentence for each charge. The four counts of rape of a child would be entered as occurring on or about April 2008, with a presumed minimum prison sentence under the law in effect at that time of fifteen years to life, but with discretion on the part of the sentencing judge to order a lower minimum of either ten years or six years.[2] The single rape count would be

---

1. Gray's plea agreement provided that he would be sentenced under the provisions of prior statutes which had lower mandatory minimum prison terms for the rape of a child and the aggravated sexual abuse of a child counts. For these counts, we cite the earlier versions of the statutes.

2. The current version of the rape of a child statute provides for a prison sentence of "not less than 25 years and which may be for

(continued…)

entered as occurring on or about May 15, 2013, with a minimum mandatory sentence of five years to life. And the count of aggravated sexual abuse of a child would be entered as occurring on or about March 2007, which on that date also provided for a minimum mandatory sentence of five years to life.[3] Gray orally entered his guilty pleas, confirmed that he understood his rights and the consequences of pleading guilty, and signed the plea agreement.

¶4 The district court scheduled a sentencing hearing for December 17, 2013. Prior to sentencing, Adult Probation & Parole (AP&P) completed a presentence investigation report (PSI). The PSI provided detailed information about Gray's offenses, his history and circumstances, and AP&P's overall assessment and sentencing recommendations. With respect to the nature and extent of Gray's crimes, the PSI indicated that Gray perpetrated his sexual abuse regularly—weekly and often multiple times per week—for nearly a decade and that he consistently badgered his victims to engage in sexual activity with him. Both victims indicated that they suffered consequences if they refused to comply. And both stated that they repeatedly requested that Gray stop the abuse, but he refused to do so, justifying his conduct with statements indicating that he did not consider his conduct to be wrong.

¶5 AP&P recommended that the court sentence Gray to the maximum of fifteen years to life for each of the four counts of

---

(…continued)
life." *Compare* Utah Code Ann. § 76-5-402.1(3) (LexisNexis Supp. 2007), *with id.* § 76-5-402.1(2)(a) (Supp. 2015).

3. The current version of the statute provides for a prison sentence of "not less than 15 years and which may be for life." *Compare id.* § 76-5-404.1(3) (Supp. 2003), *with id.* § 76-5-404.1(5)(a) (Supp. 2015).

rape of a child and five years to life for each of the rape and aggravated sexual abuse of a child counts. AP&P also identified four aggravating factors: the offenses "were characterized by extreme cruelty or depravity," including physical assault of the victims; the "victim[s] were unusually vulnerable" because the abuse began when they were young children and continued for about a decade; there was a "relationship of special trust" between Gray and his victims; and Gray "exhibited grooming, stalking, or enticing behaviors," including providing alcohol to one of his victims before some of the acts of abuse. The PSI identified no mitigating factors. AP&P further recommended that all the sentences run consecutively.

¶6 At the sentencing hearing, Gray's counsel requested that the court impose a sentence "below the recommendation that was made by . . . AP&P," explaining that the purpose of the amended plea was to allow Gray "to get out of the mandatory" twenty-five-to-life sentences for the four counts of rape of a child and "into [the] 15 but could be six or ten" range. Counsel then requested that the court impose ten years to life rather than fifteen years to life on those four counts. In support of this request, counsel pointed out that Gray gave up his rights to a preliminary hearing and a trial, sparing the victims the ordeal of testifying. Counsel also argued that the lower minimum mandatories would allow the Board of Pardons and Parole (the Board) "discretion at an earlier point in time" to consider Gray's "behavior, his conditions, [and] his circumstances" in making further sentencing determinations once the minimum time on the concurrent sentences had run. In other words, defense counsel contended that lower minimums would allow the Board to consider releasing Gray at an earlier point if he were doing well. He then stated that he believed the amended charges Gray pleaded to were intended to "allow for [this] possibility." Additionally, counsel argued that there were mitigating factors, including "amenability to supervision and . . . good employment and/or family relationships," in contrast to the PSI, which had identified none.

¶7     The prosecutor responded that he did not believe there was "a single mitigating factor in [the] case." And while he affirmed the plea agreement's provisions that reduced the potential maximum mandatory sentence from twenty-five years to fifteen years for the four rape of a child counts, he did not think there was "any mitigation for the Court to find that this would be a ten-year or six-year sentence" instead of the presumed fifteen years on those counts. The prosecutor argued that whatever Gray's successful employment history, Gray had abused one of his victims alone "hundreds of times" and that it was "pretend" to suggest Gray's willingness to forgo a jury trial amounted to meaningful mitigation. He asserted that Gray "did the worst thing that you can do to a child . . . over and over to gratify himself" and that this was "probably the most callous case [he'd] seen, short of homicide," but also noted that while homicide was "one criminal act," Gray had committed "dozens upon dozens" of criminal acts. To reinforce the point that there was more than one victim in this case, he then stated,

> I don't want to tell you all these things because I'm asking you to do more than what I've agreed. I've agreed to recommend the 15 to life counts to run concurrent with each other and I've agreed that the rape count run concurrent with those, but I have stated all along that I would ask that the last count, Count 6, run consecutive.

Immediately after making this statement, the prosecutor reiterated that only Gray "could have prevented" the suffering he caused his two victims and that Gray himself had "made his choice to go down this road, he put himself there and put himself in the cross-hairs." He then concluded by stating, "[I]f there's ever a case where [I would] ask you to do something, I would ask you to hand out the maximum punishment in this case."

¶8     Gray's two victims also made statements at the hearing. The younger victim stated that "[w]hat [Gray] did will affect [her and the other victim] for the rest of [their] lives, whether it's physically, mentally or just memories" and that she hoped the judge "w[ould] punish [Gray] in the right way so that [they could] move on and just live [their] lives." The older victim stated that she knew "that [Gray was] not sorry, he [was] not remorseful and he never will be" and that "he doesn't feel bad for what he did to either of [his victims]." She also stated that "if he ever gets out of prison, he will do it again" and that she hoped the judge would "make a decision that will make it so that that doesn't happen."

¶9     Gray made a statement at the hearing as well. He stated, "I truly am sorry for what I've done." He also stated that, "I knew that what I was doing was wrong," that, "I'm not sorry for myself, I deserve to be punished," and that, "I've tried to lessen the damage to [the affected parties] by admitting what I've done." He then asked the court for "mercy in [its] sentence so that [he] might be able to right this horrible wrong" and "make amends to [his victims] for what [he'd] done."

¶10    In response, the court stated that what Gray had done was "unexcusable and unforgiveable" and that while defense counsel had presented "very good arguments," the court "interpret[ed] [the case] completely the opposite way." In rejecting defense counsel's arguments regarding mitigation, the court indicated that the "issue" for the court was that it had "rarely ever seen this sort of conduct at the level that [Gray] [took] it." The court also agreed with one of Gray's victims who had said that she thought Gray felt "more sorry for [himself] than" for his victims, and the court observed that "[t]he reason [there was no] preliminary hearing [was] because it saved [Gray]" from "a 25 to life instead of" fifteen to life sentence for each of the rape of a child counts. The court also stated its belief that Gray "wouldn't have a problem" "put[ting] these [victims] through anything," that it saw "no redeeming value in anything

[Gray had] ever done," that what Gray's victims "went through was worse than death," and that the court considered Gray's oldest victim coming forward to report Gray's offenses as "the hardest thing in the world" to have done. The court went on to say that Gray's victims would "live with this for the rest of their [lives]" and that it was going to "write a letter to the Board of Pardons" to tell them what Gray had "put [his victims] through" and to encourage the Board to keep Gray in prison for life so that his victims would "never, ever have to worry about" future interactions with Gray again.

¶11    The court sentenced Gray to fifteen years to life on each of the four rape of a child counts, five years to life on the rape count, and five years to life on the aggravated sexual abuse of a child count. He ordered that all sentences run consecutively. Gray appeals.

ISSUES ON APPEAL

¶12    Gray first contends that the State breached the plea agreement when it asked the district court to impose the "maximum punishment in this case" despite agreeing to "recommend concurrent sentences on five of the six counts of conviction." Gray concedes that this claim is not preserved but he asserts that the court plainly erred by failing to recognize the State's breach and provide Gray a remedy. *See State v. King*, 2006 UT 3, ¶ 13, 131 P.3d 202 ("We have consistently held that a defendant who fails to preserve an objection at trial will not be able to raise that objection on appeal unless he is able to demonstrate either plain error or exceptional circumstances."[4]).

---

4. Gray does not contend that there were exceptional circumstances. Thus, we only consider Gray's claims that the district court committed plain error.

¶13 Gray next contends that the district court abused its discretion by imposing consecutive sentences, which he argues are "tantamount to imposing life without the possibility of parole" "in [a] manner that deprived the Board of Pardons of discretion to take into account Gray's future conduct and possible progress towards rehabilitation."

ANALYSIS

I. Breach of the Plea Agreement

¶14 Gray contends that because the State agreed to recommend concurrent rather than consecutive sentences on the first five counts, the prosecutor breached the plea agreement when he asked the district court to impose the "maximum punishment." Gray asserts that, in context, requesting the "maximum punishment" was equivalent to asking for consecutive rather than concurrent sentencing on all counts.[5] He argues that the district court ought to have recognized this as a breach of the plea agreement and then provided Gray a remedy sua sponte, either by allowing him to withdraw his plea or by

5. In oral argument on appeal, Gray asserted that the State breached the agreement in two ways—by asking for "maximum punishment" and by not recommending concurrent sentencing on the first five counts. However, in light of the fact that the court was aware of the concurrent sentencing recommendation, we do not view the two as substantively distinct; rather, they seem to be two sides of the same coin. For the prosecutor's "maximum punishment" statement to have been a breach, the prosecutor would necessarily have had to urge the court to impose consecutive rather than concurrent sentences on the first five counts, contrary to the recommendation the State had agreed to make. Thus, Gray's argument is essentially that by asking for the "maximum punishment," the prosecutor was, in effect, negating the recommendation for concurrent sentencing.

ordering specific performance of the plea agreement in another sentencing hearing before a different judge. *See State v. Smit*, 2004 UT App 222, ¶ 17, 95 P.3d 1203 ("[W]hen a plea agreement is breached by the prosecutor, the proper remedy is either specific performance of the plea agreement or withdrawal of the guilty plea[,] both at the discretion of the trial judge.").

¶15   However, because Gray's counsel did not assert any breach of the plea agreement during the sentencing hearing, Gray is not entitled to the remedy he seeks unless he can demonstrate plain error. A party asserting plain error must prove that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the [defendant]." *See State v. Shaffer*, 2010 UT App 240, ¶ 10, 239 P.3d 285 (alterations in original) (citation and internal quotation marks omitted). In this case, Gray must prove that the State actually breached the plea agreement, that the breach should have been obvious to the district court, and that had the district court recognized and remedied the breach, there is a reasonable likelihood that Gray's sentence would have been more favorable. "If any one of th[ese] requirements is not met, plain error is not established." *State v. Casey*, 2003 UT 55, ¶ 41, 82 P.3d 1106 (citation and internal quotation marks omitted). We conclude that it would not have been obvious to the district court that the prosecutor had committed any breach of the plea agreement and therefore Gray has not established plain error.

¶16   When a defendant alleges that the State violated a plea agreement by making inappropriate statements at sentencing, as Gray does here, we consider the prosecutor's statements in the "context of the entire hearing." *Shaffer*, 2010 UT App 240, ¶ 33. In *Shaffer*, the defendant claimed that certain statements by the prosecutor undermined the plea agreement. *Id.* ¶ 25. The statement the *Shaffer* court was "most concerned" about related to "the State['s] [agreement] to recommend that Shaffer be

sentenced to a suspended prison sentence and two years in jail with credit for time served." *Id.* ¶¶ 3, 33. At the time of sentencing, Shaffer had served "just over thirteen months" in jail. *Id.* ¶ 5. The State, however, argued to the court that "Shaffer's behavior warrants, *at minimum,* another year in jail followed by 36-months probation." *Id.* ¶ 7 (emphasis added) (internal quotation marks omitted). Shaffer argued on appeal that the "at minimum" language undermined the State's agreement to recommend only one more year of jail time, taking into account the time already served. *Id.* ¶ 9. We disagreed, noting that the State made its "at minimum" statement "in the context of the prosecutor's discussion of probation conditions" and that in the context of the entire hearing, the impact of the statement was "minimal" where it was "clear that the State's overall posture was one of support for the sentence it recommended to the trial court." *Id.* ¶¶ 33–34. We concluded that while the statement was worrisome, "[i]n the context of the entire hearing, the 'at minimum' statement did not undermine the recommendation so as to constitute a plain breach of the plea agreement." *Id.* ¶ 33.

¶17    Similarly, in this case, the context of the hearing as a whole does not support Gray's claim that the State breached its agreement when it urged the district court "to hand out the maximum punishment in this case." And even assuming the prosecutor's statement transgressed, any breach would not have been obvious to the district court.

¶18    The prosecutor made essentially two arguments during his sentencing statement. First, he responded to defense counsel's argument that there were mitigating circumstances that supported a ten year minimum mandatory for the four counts of rape of a child by contending that there was not "a single mitigating factor" to justify a sentence of less than fifteen years to life on those counts. He described the circumstances of the crimes to underscore this point, and at the conclusion of this discussion, he accurately, if not enthusiastically, described the

recommendation the State had agreed to make for concurrent sentences on the first five counts. Second, the prosecutor asserted that while he was recommending that the first five counts run concurrently in accordance with the plea agreement, he had "stated all along that [he] would ask that the last count, Count 6, run consecutive" in order "to represent the fact that there [were two] victims in this case." Although the prosecutor requested that the court impose the "maximum punishment" at the conclusion of his presentation, we conclude that in the context of the entire sentencing hearing, that statement cannot reasonably be interpreted as amounting to a recantation of the State's promised recommendation. Nor do we think that the statement impermissibly undermined the prosecutor's promise by conveying improper "regret" or "personal reservations." *See id.* ¶ 26. Instead, the context supported a reasonable interpretation that comported with, rather than departed from, the State's obligations under the plea agreement.

¶19 In this regard, the plea agreement's sentencing recommendations themselves form an important part of the context in which the prosecutor's statements must be interpreted. In particular, the plea agreement left open for argument important aspects of the sentence. For instance, while the agreement assured Gray the benefit of a significantly lower range of minimum mandatory sentences on the four counts of rape of a child, it did not constrain the State from arguing that the court should impose the maximum fifteen year minimum sentence rather than the six or ten year minimum that Gray's counsel urged. In addition, while the State agreed to a recommendation that the sentences on five of the counts be imposed concurrently, it reserved the right to argue for a consecutive sentence on the sixth count, a point that the prosecutor acknowledged when he described the plea agreement's sentencing recommendation to the district court. Thus, the agreement's sentencing recommendation encompassed a potential range of punishment from a minimum of six years to life on the first four counts, with concurrent sentencing on all six

counts, to a maximum of fifteen years to life on the first four counts, with five counts concurrent and the sixth consecutive. Within this range, Gray could argue for leniency and the State for relative rigor.

¶20   At the sentencing hearing, both counsel took advantage of the opportunities the plea agreement afforded them. Gray's counsel, citing positive aspects of Gray's history in mitigation, urged the court to impose the middle option of ten years to life on the first four counts and to run the sentences on all six counts concurrently. The prosecutor responded that the circumstances justified nothing less than the presumptive fifteen years to life on the four rape of a child counts and opposed counsel's assertion of mitigating circumstances with a description of the severity of the crimes, emphasizing that there were two young victims whom Gray had abused for years. Then, to ensure that the district court did not interpret his impassioned plea as a request that the court go beyond the bounds of the plea agreement, the prosecutor stated, "I don't . . . tell you all these things because I'm asking you to do more than what I've agreed," and proceeded to recount the agreement's sentencing recommendations, including the specific recommendation for concurrent sentences on five of the counts. *See State v. Shaffer*, 2010 UT App 240, ¶ 26, 239 P.3d 285 (stating that "a prosecutor has no responsibility to make [its agreed-upon] recommendations enthusiastically" and that "[i]f the prosecutor promises to recommend a certain sentence and does so, [s]he has not breached the bargain by also bringing all relevant facts to the attention of the court" (third alteration in original) (citations and internal quotation marks omitted)). Thus, in context, the prosecutor's "maximum punishment" statement is reasonably seen as an argument that the district court impose the maximum sentence contemplated by the plea agreement, in counterpoise to the argument of Gray's counsel for a sentence nearer the agreement's minimum.

¶21 As a consequence, we are not persuaded that there was any breach of the plea agreement, much less that the alleged breach would have been obvious to the district court.[6] *See id.* ¶¶ 33–35 (where it was "clear that the State's overall posture was one of support for the sentence it recommended to the trial court," the context in which the "at minimum" statement was made precluded the prosecutor's recommendation from being a plain breach); *see also State v. Friel*, 2015 UT App 95, ¶¶ 8–9, 348 P.3d 724 (determining that an alleged mischaracterization of the plea agreement was not obvious to the court because the district

---

6. Gray does not raise an ineffective assistance of counsel claim on appeal. But, even so, we also note that defense counsel did not object to the prosecutor's request for "maximum punishment" at any point during the sentencing hearing or request a correction from the court. Moreover, even in his final statement to the court, which followed on the heels of the prosecutor's request for "maximum punishment," defense counsel simply reiterated his request that the sentence be imposed in a manner that would allow the Board to evaluate Gray "some ten or 15 or more years down the road." He did not refer to the prosecution's "maximum punishment" request or object to its characterization of the agreement. While defense counsel's inaction is certainly not dispositive, his silence suggests that he saw no error in the prosecutor's presentation worthy of correction and reinforces our conclusion that the alleged breach, if any, was not obvious. *See Puckett v. United States*, 556 U.S. 129, 133 (2009) (noting that "[i]mportantly, at no time during the exchange did Puckett's counsel object that the Government was violating its obligations under the plea agreement"); *see also State v. Friel*, 2015 UT App 95, ¶ 8, 348 P.3d 724 (noting that, because defendant "never alerted the district court" that she believed "the State's characterization of the plea agreement did not comport with her understanding" of it, her disagreement "would not have been obvious" to the district court).

court "could have reasonably believed" that the defendant "understood that the plea agreement's benefits were contingent upon [defendant's] compliance" with a particular presentencing order requirement). Because Gray has not demonstrated that the prosecutor's breach was an error that should have been obvious to the district court, we need not consider whether the alleged error was harmful. Rather, "if any one of these requirements is not met, plain error is not established." *State v. Casey*, 2003 UT 55, ¶ 41, 82 P.3d 1106 (citation and internal quotation marks omitted).

## II. Consecutive Sentences

¶22  Gray next argues that the district court abused its discretion by "ordering all of [his] sentences to run consecutively" for an aggregate minimum term of seventy years in prison. He contends that his sentence is an abuse of discretion because it is "tantamount to imposing life without the possibility of parole" and contravenes the policy of providing the Board with "wide latitude in deciding what a maximum sentence ought to be." In this regard, Gray contends that the Utah Supreme Court's decisions in *State v. Galli*, 967 P.2d 930 (Utah 1998), *State v. Smith*, 909 P.2d 236 (Utah 1995), and *State v. Strunk*, 846 P.2d 1297 (Utah 1993), "compel the conclusion that the sentencing court" abused its discretion "by imposing [a] sentence[] that amount[ed] to a 70-year minimum term."

¶23  We will not overturn a sentence "unless the trial court has abused its discretion, failed to consider all legally relevant factors, or imposed a sentence that exceeds legally prescribed limits." *State v. Nuttall*, 861 P.2d 454, 456 (Utah Ct. App. 1993); *see also State v. Helms*, 2002 UT 12, ¶ 8, 40 P.3d 626 (stating that an appellate court "traditionally afford[s] the trial court wide latitude and discretion in sentencing" (alteration in original) (citation and internal quotation marks omitted)). Because sentencing "reflects the personal judgment of the court, . . . a sentence imposed by the trial court should be overturned only when it is inherently unfair or clearly excessive." *Helms*, 2002 UT

12, ¶ 14. In this regard, "[a] court abuses its discretion in imposing consecutive sentences only if no reasonable [person] would take the view [adopted] by the [sentencing] court." *State v. Thorkelson*, 2004 UT App 9, ¶ 12, 84 P.3d 854 (second and fourth alterations in original) (citation and internal quotation marks omitted).

A.      Utah Courts May Impose Multiple Consecutive Sentences

¶24      Gray contends that the district court abused its discretion by imposing all six of his sentences consecutively because, given that Gray was thirty-nine years old when he was sentenced, there is no reasonable probability that he will live to be paroled and, consequently, the Board will be deprived of the ability to exercise meaningful review of his progress toward parole or to release him "during his lifetime."[7] We understand his argument to be that it is fundamentally unreasonable for a court to impose consecutive sentences that practically result in a sentence of life without the possibility of parole. The State counters that Gray's concerns regarding the Board's discretion are allayed by a 1996 statutory amendment that granted the Board discretion to "release any offender before the minimum term has been served" if it finds "mitigating circumstances [to] justify the release." *See* Utah Code Ann. § 77-27-9(1)(a), (b) (LexisNexis 2012). In essence, the State argues that because the Board now has authority to release an offender who is sentenced to prison for crimes like Gray's before the expiration of the minimum mandatory portion of the sentence if mitigating circumstances justify it, Gray's sentence should not be considered the equivalent of life without parole. The State also asserts that even

---

7. As the State notes, Gray does not argue that, given the specific circumstances of his case, it was an abuse of discretion for the district court to impose any consecutive sentence at all; in fact, the plea agreement expressly contemplated the potential for at least one consecutive term.

if the Board did not have authority to release him early, Gray "has not shown that the trial court abused its discretion [in imposing consecutive sentences] under the appalling facts of this case."

¶25 To determine whether it was an abuse of discretion for the district court to have imposed consecutive sentences for all of Gray's offenses, we first consider whether it is a per se abuse of discretion for a district court to impose multiple consecutive sentences of this length upon an offender under our sentencing statute, Utah Code section 76-3-401. Because we conclude it is not, we next consider whether the principles underlying the cases Gray primarily relies upon or policy considerations related to the Board's authority to grant parole require us to set aside Gray's sentences. Finally, we will consider whether Gray has provided us any other basis upon which to vacate or modify his sentence.

1.  The Sentencing Statute Permits the Imposition of Multiple Consecutive Sentences.

¶26 When we interpret statutes, "our primary goal is to evince the true intent and purpose of the [l]egislature" and "[t]he best evidence of the legislature's intent is the plain language of the statute itself." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (citations and internal quotation marks omitted). Thus, we presume that the legislature "used each term advisedly according to its ordinary and usually accepted meaning." *Id.* (citation and internal quotation marks omitted).

¶27 The legislature has explicitly empowered sentencing courts to impose consecutive sentences. *See* Utah Code Ann. § 76-3-401(1), (2). The statute provides that courts may impose consecutive sentences on "a defendant [who] has been adjudged guilty of more than one felony offense" if the facts and circumstances of the case warrant it. *Id.* Prior to 2002, the statute expressed a preference for concurrent sentences, providing that "[s]entences for state offenses shall run concurrently unless the

court states in the sentence that they shall run consecutively." *Id.* § 76-3-401(1) (LexisNexis 1999); *see also State v. Galli*, 967 P.2d 930, 938 (Utah 1998) ("We have stated, '[Utah Code Ann. section 76-3-401] favors concurrent sentences.'" (quoting *State v. Strunk*, 846 P.2d 1297, 1301 (Utah 1993))). However, in 2002, the legislature adopted more neutral language, with the current version of Utah Code section 76-3-401 simply stating that in the case of a defendant who is convicted of multiple felonies, "[a] court shall determine . . . whether to impose concurrent or consecutive sentences." *See* Utah Code Ann. § 76-3-401(1) (LexisNexis 2012); *see also id.* § 76-3-401(2). The court must take into account certain factors in deciding whether to impose consecutive sentences: "the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant." *Id.* § 76-3-401(2).

¶28　There is no statutory language restricting the number of consecutive terms a court may impose on an offender. Instead, the only stated limitation on the number of consecutive sentences is found in subsection 76-3-401(6), which by its terms, is inapplicable to Gray's sentences. It states that "if a court imposes consecutive sentences, the aggregate maximum of all sentences imposed may not exceed 30 years imprisonment," unless one of two conditions is met: either "(i) an offense for which the defendant is sentenced authorizes the death penalty or *a maximum sentence of life imprisonment*; or (ii) the defendant is convicted of an additional offense based on conduct which occurs after his initial sentence or sentences are imposed." *Id.* § 76-3-401(6)(a), (b) (emphasis added). The statute also qualifies this limitation on time served with the statement that "[t]his section may not be construed to restrict the number or length of individual consecutive sentences that may be imposed or to affect the validity of any sentence so imposed." *Id.* § 76-3-401(10). While the limitation applies to maximum sentences rather than to the length of minimum mandatory sentences, the fact that the legislature included such a specific limitation only for non-first-degree felonies emphasizes the absence of any statutory

limitation on consecutive sentences applicable to offenses subject to maximum terms of life imprisonment. *See Marion Energy*, 2011 UT 50, ¶ 14 (stating that we "presume[] that the expression of one [term] should be interpreted as the exclusion of another" and that we "therefore seek to give effect to omissions in statutory language by presuming all omissions to be purposeful" (alterations in original) (citation and internal quotation marks omitted)).

¶29 In addition, it is worth noting that the legislature has increased rather than decreased the minimum mandatory term of imprisonment for sexual offenses against children in recent years,[8] and it has done so without making any change in the sentencing statute to limit the number of consecutive sentences that a court may impose upon a defendant, who, like Gray, is convicted of multiple offenses that permit life imprisonment with relatively high minimum mandatories. *See* Utah Code Ann. § 76-5-402.1(2)(a) (LexisNexis Supp. 2015) (increasing the minimum term of imprisonment for a rape of a child conviction to "25 years and which may be for life"); *id.* § 76-3-401 (2012). For

---

8. The penalties for other offenses against children have increased in recent years as well. *Compare* Utah Code Ann. § 76-5-301.1(3) (LexisNexis Supp. 2003) (providing that first degree felony child kidnapping is punishable under ordinary circumstances by "imprisonment for an indeterminate term of not less than 6, 10, or 15 years and which may be for life"), *and id.* § 76-5-403.1(2)(a) (Supp. 2007) (providing that first degree felony sodomy on a child is punishable by "not less than 15 years and which may be for life"), *with id.* § 76-5-301.1(3) (Supp. 2015) (providing that first degree felony child kidnapping is punishable by a term of imprisonment "not less than 15 years and which may be for life"), *and id.* § 76-5-403.1(2)(a) (Supp. 2015) (providing that first degree felony sodomy on a child is punishable by "not less than 25 years and which may be for life").

instance, had Gray been sentenced consecutively under the current version of the rape of a child statute, his total sentence would have been a minimum of 110 years imprisonment (including the other two offenses to which he pleaded guilty) rather than seventy. Further, under the current version, even one twenty-five year minimum sentence imposed on a person a dozen years older than Gray could, as a practical matter, potentially amount to life without parole, while a defendant convicted of two counts of rape of a child could face a minimum mandatory sentence of fifty years imprisonment if sentences were imposed consecutively. And yet, the legislature has not chosen to adopt any limitation on the number or effect of consecutive sentences in such circumstances. Rather, under the plain language of the statute, the only limitation on consecutive sentences continues to be the requirement that the sentencing court appropriately consider the statutory factors—"the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant." *Id.* § 76-3-401(2).

2.      Precedent Does Not Foreclose the Possibility of Multiple Consecutive Sentences.

¶30     Even if the statute itself does not prohibit stacking consecutive sentences in a manner that may effectively amount to life imprisonment without a possibility of parole, Gray contends that our supreme court has determined that preservation of the Board's statutory discretion to permit release after the minimum term of an indeterminate life sentence is an overriding factor in a case such as this. In particular, he contends that three supreme court decisions—*State v. Galli*, 967 P.2d 930 (Utah 1998), *State v. Smith*, 909 P.2d 236 (Utah 1995), and *State v. Strunk*, 846 P.2d 1297 (Utah 1993)—compel the conclusion that consecutive sentences may not be imposed if they deprive the Board of the ability to parole an offender during the offender's probable lifetime. In each of those decisions, our supreme court held that the imposition of multiple consecutive sentences was

an abuse of discretion, focusing particularly on the way those stacked minimum mandatory sentences impaired the Board's discretion to release an offender at an earlier point in time if warranted by rehabilitative progress. In each case, the court vacated the consecutive sentences and remanded the cases for resentencing.

¶31 However, Gray's argument misconstrues the current scope of the Board's role and authority within Utah's indeterminate sentencing scheme and too narrowly interprets the cases themselves. Each of Gray's convictions carries the possibility of life imprisonment, and ordinarily, the Board shall construe an indeterminate sentence "to be a sentence for the term between the minimum and maximum periods of time provided by law [that] shall continue until the maximum period has been reached unless sooner terminated or commuted" by the Board. *See* Utah Code Ann. § 77-18-4(3) (LexisNexis 2012). Consequently, the sentencing court and the Board have "two separate and distinct powers" in our indeterminate sentencing scheme: the sentencing court "*must* set an indeterminate sentence as provided by statute," and the Board then "exercises its constitutional authority to commute or terminate an indeterminate sentence that, but for the Board's discretion, would run until the maximum period is reached." *Padilla v. Utah Bd. of Pardons & Parole*, 947 P.2d 664, 669 (Utah 1997). Thus, indeterminate sentencing is designed to "give the Board of Pardons wide latitude in deciding what a maximum sentence ought to be." *Smith*, 909 P.2d at 244; *see also Padilla*, 947 P.2d at 669 ("By its very term, the indeterminate sentence shall continue until the maximum period expires *unless* the Board, in its discretion, terminates or commutes the punishment or pardons the offender." (citation and internal quotation marks omitted)).

¶32 Although the Board's role in determining the maximum sentence is clearly important to the assessment of the "rehabilitative needs" factor, that role is not the only consideration in play when a defendant is sentenced to

consecutive terms. Gray seems to argue that under *Smith*, *Strunk*, and *Galli*, *any* consecutive sentence that significantly intrudes upon the Board's ability to parole an offender is an abuse of discretion, regardless of the evidence presented regarding the other consecutive sentencing factors under section 76-3-401. But the supreme court decided each of those cases based on the totality of the circumstances and the evidence related to the statutory factors, *including* the need to preserve Board discretion; limitation on the Board's discretion, while a significant consideration, was not the only factor that justified reversal in those cases. Indeed, the court in *Smith* specifically limited its ruling "to the facts of [that] case" and stated that it did "not mean to imply by [the] ruling that consecutive sentences are never appropriate." *Smith*, 909 P.2d at 245.

¶33    Further, all three cases characterized the Board's ability to grant parole as implicating just one of the consecutive sentencing factors—the defendant's rehabilitative needs—among the several factors that a district court must consider under section 76-3-401. The court in *Smith* stated that the Board's latitude to decide what a maximum sentence ought to be, based upon "defendant's subsequent behavior and possible progress toward rehabilitation while in prison," was "[a]n additional and highly important factor" along with those listed in section 76-3-401. 909 P.2d at 244. And both *Galli* and *Strunk* characterized the Board's flexibility to release an inmate earlier than consecutive sentences would permit as a consideration under the general "rehabilitative needs of the defendant." *Galli*, 967 P.2d at 938 (stating that "[t]he imposition of concurrent rather than consecutive sentences better serves Galli's rehabilitative needs by allowing the Board . . . to release him from prison [sooner] . . . if he has shown genuine progress toward rehabilitation"); *Strunk*, 846 P.2d at 1302 (reversing the consecutive sentencing to "afford the Board of Pardons the flexibility to adjust Strunk's prison stay to match his progress in rehabilitation and preparation to return to society"). In other words, these cases characterized the Board's ability to grant parole as an integrated

component of the rehabilitative needs factor that must be balanced along with, and not apart from, the other required factors under section 76-3-401.

¶34   For instance, in *Smith*, the defendant was convicted of aggravated kidnapping, rape of a child, and two counts of sodomy on a child, all first degree felonies, based on events that occurred in a single criminal episode where the defendant kidnapped a six-year-old child at knife point, drove her to a remote location, and sexually assaulted her. 909 P.2d at 238–39. The sentencing court imposed consecutive sentences on all counts, resulting in a minimum mandatory sentence of sixty years to life. *Id.* at 238. The supreme court noted that although the sentencing court had considered all required factors under Utah Code section 76-3-401 when it imposed consecutive sentences, the length of the aggregate mandatory minimum sentences meant that the Board would have "no discretion to release defendant, irrespective of his progress, until sixty years ha[d] elapsed." *Id.* at 244. The supreme court also deemed it significant that even though the "defendant was convicted of four crimes, . . . all of them arose out of one criminal episode." *Id.* at 245. Ultimately, the supreme court concluded that the district court's imposition of consecutive sentences was "unreasonable and an abuse of discretion" because the sentences amounted essentially to "a minimum mandatory life sentence—a sentence that the Legislature has only permitted for capital murder" that "deprive[d] the Board of Pardons of discretion to take into account defendant's future conduct and possible progress toward rehabilitation." *Id.* at 244–45.

¶35   In *Strunk*, a sixteen-year-old boy kidnapped a six-year-old girl, molested her, and killed her. 846 P.2d at 1298. He pleaded guilty to first degree murder, child kidnapping, and aggravated sexual abuse of a child. *Id.* The district court ordered the sentences for each count "to run consecutively." *Id*. The supreme court reversed, concluding that the imposition of consecutive sentences "rob[bed] the Board of Pardons of any flexibility to

parole Strunk sooner." *Id.* at 1301. In particular, it concluded that "in light of [Strunk's] extreme youth and the absence of prior violent crimes," the district court failed "to sufficiently consider [Strunk's] rehabilitative needs" when it imposed consecutive sentences. *Id.* at 1302. The case was remanded to the district court with instructions to order "all three terms . . . to run concurrently to afford the Board of Pardons the flexibility to adjust Strunk's prison stay to match his progress in rehabilitation and preparation to return to society." *Id.*

¶36    And finally, in *Galli*, the defendant pleaded guilty to three aggravated robberies committed within a three-month period. *State v. Galli*, 967 P.2d 930, 931 (Utah 1998). Prior to sentencing, he fled the state, but he was eventually recaptured three years later. *Id.* at 932. He was sentenced in separate cases to three consecutive terms of five years to life. *Id.* at 932–33. The supreme court concluded that the sentencing courts had abused their discretion in sentencing him to consecutive terms and reversed. *Id.* at 938–39. In particular, the supreme court concluded that the courts had not given proper weight to certain sentencing factors. *Id.* at 938. For example, the supreme court noted that, while Galli pleaded guilty to aggravated robbery, he had not injured anyone during the commission of the crimes, the weapon that aggravated the charges was a pellet gun "incapable of inflicting serious injury," and the amount of money he actually took was quite small. *Id.* The court also noted that his prior criminal history was minor (traffic offenses and one misdemeanor theft) and that there were facts regarding his character—among them, that he had voluntarily confessed and had "obeyed the law, helped his neighbors, and was a productive individual" during the three years prior to being recaptured—that suggested he was willing and able to improve himself. *Id.* Finally, the court also concluded that the consecutive sentences were "not in accord with [his] rehabilitative needs" because he had demonstrated the ability to be rehabilitated during the three years he was out of state and that the "imposition of concurrent rather than consecutive sentences better serve[d] [his] rehabilitative needs"

because it would allow the Board "to release him from prison after five years if he [had] shown genuine progress toward rehabilitation." *Id.*

¶37   In each of these cases, the court did not decide to reverse the consecutive sentencing decisions simply because the minimum mandatory prison terms were overly lengthy given the age and probable lifespan of the sentenced defendant. Nor did the court reverse the consecutive sentences simply to allow the Board flexibility to parole the defendants at an earlier point in time—although that was an important consideration. Rather, in addition to expressing concerns about tying the Board's hands, the court pointed to specific facts in each case that bore on other statutory consecutive sentencing factors, including the nature of the crime, previous criminal history, character, and rehabilitative potential of the defendant, and the defendant's youth. In *Smith*, even though the defendant's crimes were "heinous," the court considered it significant that all of the offenses "arose out of one criminal episode" and that the Board had "no discretion" to release Smith early even if his "future conduct and possible progress toward rehabilitation" warranted it. 909 P.2d at 244–45. In this regard, the court seemed to be implicitly stating that it believed the circumstances surrounding Smith's crimes suggested that there existed at least a possibility that Smith might be rehabilitated before the end of a prison commitment sixty years in the future. In *Strunk*, the supreme court reversed "in light of [Strunk's] extreme youth and the absence of prior violent crimes." 846 P.2d at 1302. And in *Galli*, it was the combination of circumstances—the nature of his crime, his history, his character, and his proven rehabilitative potential—that convinced the court the consecutive sentences were an abuse of discretion. 967 P.2d at 938–39.

¶38   Furthermore, to the extent that Gray's argument rests on a contention that the district court inadequately considered his rehabilitative needs given his age, we have previously observed that a defendant's age may actually "minimize his prospects for

rehabilitation" and instead "exacerbate . . . his culpability." *See State v. Nuttall*, 861 P.2d 454, 457–58 (Utah Ct. App. 1993). In *Nuttall*, the defendant was fifty-six years old and had sexually abused multiple children over a twenty-year period. *Id.* at 455. He pleaded guilty to two counts of aggravated sexual abuse of a child and was sentenced to serve two consecutive minimum mandatory terms, each nine years to life. *Id.* at 454. The defendant argued that "the trial court should have considered his advanced age as a mitigating factor," and that "the juxtaposition of his age and the consecutive sentences impose[d] an unfair delay" regarding his ability to enter sex offender rehabilitation or his eligibility for parole. *Id.* at 456 (footnote omitted). In particular, he used *Strunk* to support his argument, asserting that *Strunk* "stands for the proposition that a court must look at the defendant's age—whether young or old—as a mitigating factor." *Id.* at 456–57. However, we rejected the analogy to *Strunk*, concluding that "defendant's age and the number of years he has engaged in pedophilic activity actually minimize[d] his prospects for rehabilitation and exacerbate[d] . . . his culpability" and that *Strunk* "stands only for the proposition that young age—not old age—may be a mitigating factor." *Id.* at 457–58.

¶39 Thus, none of the cases Gray relies on stand for the proposition that the imposition of a lengthy sentence that may not allow for a realistic possibility of parole by the Board is automatically an abuse of discretion. Instead, these cases support the conclusion that in deciding whether lengthy consecutive sentences may be imposed, preservation of the Board's flexibility to parole defendants earlier than consecutive minimum mandatory sentences would allow may not always outweigh all other factors. Rather, courts must consider the totality of the circumstances in determining whether a district court has abused its discretion by imposing consecutive sentences that carry lengthy minimum mandatory terms. In other words, we must consider whether, under all of the circumstances, the

particular consecutive sentences imposed were "clearly excessive."

3.    Subsequent Legislation Has Moderated Concerns About Interference with the Board's Discretion to Grant Parole.

¶40    Finally, as the State pointed out in its briefing, the Board's authority to parole a defendant has been enhanced since *Smith*, *Strunk*, and *Galli* were decided. Before 1996, during the period when *Smith* and *Strunk* were decided, the Board had no authority to parole offenders sentenced to prison like Gray before they had served their minimum terms. *See* Utah Code Ann. § 77-27-9(1), (2)(a) (Michie 1995). This restriction was specifically reiterated with respect to certain first degree felonies against children, such as rape or aggravated sexual abuse of a child, where the relevant sentencing statute prohibited release from incarceration until the "offender ha[d] fully completed serving the minimum mandatory sentence imposed by the court." *Id*. § 77-27-9(2)(a).

¶41    In 1996, however, the legislature amended the statute to grant the Board authority to "release any offender before the minimum term has been served [if] the board finds mitigating circumstances which justify the release," subject to "a full hearing" and appropriate notice, presumably to victims and other interested parties. *See id.* § 77-27-9(1)(a), (b) (LexisNexis 2012). Contemporaneously with that change, the specific restriction on early release for certain crimes against children, such as those at issue in this case, was removed from the statute. *See id.* As a result, the Board now has discretion to release an inmate who is sentenced to prison for the crimes Gray has been convicted of before the inmate has served an otherwise mandatory minimum term.

¶42    Though it is possible that the Board will consider its discretion to release an inmate before he has served the minimum sentence to be more constrained than its usual parole authority, the term "mitigating circumstances" seems broad

enough to contemplate considerations of age, health, progress in rehabilitation, the possibly changing attitudes and needs of victims, or even the sheer length of a sentence, among other things that could be considered as supporting a decision to alleviate or make less severe a minimum mandatory sentence.[9] *See Alvillar v. Board of Pardons & Parole*, 2014 UT App 61, ¶ 6, 322 P.3d 1204 (per curiam) (stating that "the Board may consider and weigh any factors that it deems relevant to its determination of whether or not an inmate will be afforded parole, which is precisely the kind of issue [that is] not subject to judicial review" (alteration in original) (citation and internal quotation marks omitted)); *Godfrey v. Board of Pardons & Parole*, 2013 UT App 171, ¶ 6, 306 P.3d 852 (per curiam) ("The [sentencing] guidelines are merely estimates that reflect what may be a typical term. The Board retains full discretion to determine incarceration terms on an individual basis considering the unique facts of each case."); *see also* 2015 Adult Sentencing & Release Guidelines, "*Aggravating and Mitigating Circumstances*," 21, http://www.utah. gov/pmn/files/172049.pdf [https://perma.cc/8A45-95KE] (noting

---

9. The term "mitigating circumstances" is not defined by statute, nor has it been judicially interpreted. But a common meaning of the word "mitigate" is "to make less severe." *See Mitigate*, Dictionary.com, http://www.dictionary. com/browse/mitigate [https://perma.cc/AH3K-B7LP]; *see also* Merriam-Webster.com, http://www.merriam-webster.com/ dictionary/mitigate [https://perma.cc/QWV8-XK7A], (defining "mitigate" as "to make (something) less severe, harmful, or painful"). And in the context of a judgment or punishment for a crime, a "mitigating circumstance" is "[a] fact or situation that does not justify or excuse a wrongful act or offense but that reduces the degree of culpability and thus may reduce the . . . punishment (in a criminal case)" or "[a] fact or situation that does not bear on the question of a defendant's guilt but that may bear on a court's possibly lessening the severity of its judgment." *Circumstance*, Black's Law Dictionary (10th ed. 2014).

that while Form 2, the Aggravating and Mitigating Circumstances Form, lists "[s]ome of the more common reasons" for deviating from the guidelines, "[o]ther reasons, as they occur, can be specified"). Consequently, although lengthy consecutive sentences imposed by a district court may still mean that under ordinary circumstances an inmate will serve his minimum sentence before becoming eligible for parole, the Board's ability to consider a "mitigating circumstances" release means an aggregate minimum sentence cannot be considered invariably mandatory.

¶43 Thus, the particular policy concern evident in the *Smith/Strunk/Galli* line of cases—assuring a possibility for the Board's earlier involvement in each defendant's case—has been legislatively moderated. When the defendants in those cases were sentenced, the Board was constrained in its authority to release them before they completed their minimum terms even if their rehabilitative progress warranted earlier re-entry into society. In particular, the *Smith* court's description of Smith's sentence as "tantamount to a minimum mandatory life sentence" was justified because the stacked consecutive terms made it impossible for the Board to release him before he had fully served his entire sixty-year minimum sentence. *State v. Smith*, 909 P.2d 236, 244–45 (Utah 1995); *see also State v. Epling*, 2011 UT App 229, ¶ 20, 262 P.3d 440 (discussing the consecutive sentencing in *Galli* and noting that "the combination of the mandatory minimum sentences for each of the crimes resulted in the defendant [in *Galli*] being required to serve fifteen years before he could be considered for parole"). It is no longer accurate, however, as it was when *Smith* was decided, to describe Gray's sentence as "tantamount to a minimum mandatory life sentence" when, given the Board's discretion to consider a mitigating circumstance release, his minimum sentence is no longer strictly mandatory.

¶44 Accordingly, we are not persuaded that imposing a lengthy consecutive sentence is a per se abuse of discretion

where the possibility of Board intervention is no longer foreclosed as it had been in the past. We do not mean to imply that *Smith*, *Strunk*, and *Galli* are no longer good law in this regard. A significant policy undergirding the sentencing decisions in those cases was that the Board's "separate and distinct power" to parole is a substantial concern that district courts should take into account in deciding whether to impose consecutive sentences.[10] *See Padilla v. Utah Bd. of Pardons & Parole*, 947 P.2d 664, 669 (Utah 1997) ("[W]hile the courts have the power to sentence, the Board has been given the power to pardon and parole. These are two separate and distinct powers, neither of which invades the province of the other."); *see also* Utah Code Ann. § 77-18-4(3) (LexisNexis 2012) (providing that "[e]xcept as otherwise expressly provided by law, every [indeterminate] sentence . . . shall be construed to be a sentence

---

10. Indeed, since the 1996 amendment we have continued to take into account the Board's power to grant parole in challenges to consecutive sentences, though it is not clear that the amendment itself has been acknowledged. *See State v. Spencer*, 2011 UT App 219, ¶ 12, 258 P.3d 659 (concluding that "[c]onsecutive sentencing that . . . does not significantly or meaningfully detract from the Board's discretion to parole [a] defendant at the appropriate time" is permissible within the "acknowledged policy of ensur[ing] that the Board of Pardons is given the appropriate opportunity to determine the ultimate length of an individual's sentence" (third alteration in original) (citation and internal quotation marks omitted)); *State v. Valdez*, 2008 UT App 329, ¶ 14, 194 P.3d 195 (affirming imposition of consecutive sentences "because [the defendant's] sentence is consistent with the supreme court's admonition that the Board of Pardons be given the responsibility 'to monitor [the defendant's] subsequent behavior and possible progress toward rehabilitation while in prison and to adjust the maximum sentence accordingly'" (alteration in original) (quoting *State v. Smith*, 909 P.2d 236, 244 (Utah 1995))).

for the term between the minimum and maximum periods of time provided by law and shall continue until the maximum period has been reached unless sooner terminated . . . by authority of the Board of Pardons and Parole"); *Smith*, 909 P.2d at 244 (describing the Board's authority to determine what the maximum sentence ought to be as "[a]n additional and highly important factor in deciding whether to impose consecutive or concurrent sentences"). And while the Board's authority to release inmates on parole after the minimum term expires seems nearly plenary, *see* Utah Code Ann. § 77-27-5(3) ("Decisions of the board in cases involving paroles, pardons, commutations or termination of sentence . . . are final and not subject to judicial review."), the Board's discretion to release a defendant earlier based on "mitigating circumstances," though conceptually broad, may be intended as a safety valve to be employed in unusual circumstances rather than a wholesale extension of that plenary power. Thus, the lesson of the *Smith/Strunk/Galli* line of cases remains valid—that is, although the statutory context implicating the relationship of consecutive sentencing and the Board's authority to parole has changed, courts should still keep in mind the central role that the Board's parole authority continues to play in our indeterminate sentencing scheme when considering whether to impose sentences consecutively.[11]

---

11. The concurrence disagrees with our assertion that a sentencing court ought to continue to take into account the Board's role when imposing a consecutive sentence. It suggests that the "mitigating circumstances" release provision of Utah Code section 77-27-9(1)(a) is the whole solution to the concerns voiced by the supreme court in the *Smith/Strunk/Galli* cases regarding the Board's authority to parole an inmate earlier if rehabilitative progress warrants it. But, in our view, that interpretation takes the effect of the 1996 amendment too far. Our indeterminate sentencing scheme consists of two "separate and distinct powers"—the power to sentence and the power to

(continued…)

B.    Gray's Sentence Has Not Been Otherwise Shown to Be an Abuse of the District Court's Discretion.

¶45    Because we have concluded that it is not a per se abuse of discretion to impose lengthy consecutive sentences, to prevail on appeal Gray must demonstrate that his sentence is "clearly excessive" in some other way. But Gray has not done so. Instead, his arguments are decidedly policy-based and give only cursory

---

(…continued)
pardon and parole. *See Padilla v. Utah Bd. of Pardons & Parole*, 947 P.2d 664, 669 (Utah 1997). While a sentencing court "must" impose a sentence in every case, the Board is not required to parole every defendant. Indeed, the default assumption is that a sentence "shall continue until the maximum period expires *unless* the Board, in its discretion," chooses to terminate the sentence. *Id.*; *see also* Utah Code Ann. § 77-18-4 (LexisNexis 2012) (explaining that an indeterminate sentence should ordinarily be "construed to be a sentence for the term between the minimum and maximum periods of time provided by law"). Although we agree with the concurrence that the "mitigating circumstances" release provision is pertinent to the concerns expressed in the *Smith/Strunk/Galli* line of cases, we are hesitant to conclude that section 77-27-9(1)(a) simply eliminates those concerns. Rather, even if the Board ultimately views its "mitigating circumstances" release authority to be coextensive with its plenary power to grant parole, the sentence imposed by the court is still the default—indeed, the backbone—that the Board has to work with, and that sentence is still presumed to continue unless the Board determines that there are reasons to justify an earlier release. Given this, we think it continues to be important, simply as a matter of prudence, for a sentencing court to take into account in considering the rehabilitation factor whether a particular consecutive sentencing decision may unduly "invade[] the province" of the Board's parole authority. *Padilla*, 947 P.2d at 669.

attention to the circumstances attendant to his own case. He argues that, as a general policy, a district court abuses its discretion if it imposes a minimum mandatory sentence that is "tantamount to life without the possibility of parole," particularly in light of the Board's role. He further contends that, as a consequence, the consecutive sentences the district court imposed were an abuse of discretion because he was thirty-nine years old at the time he was sentenced to the seventy-year minimum mandatory sentence. Apart from these arguments, however, he has not attempted to demonstrate that his sentence exceeded the bounds of the court's discretion. Certainly, he has not persuaded us that given the totality of the circumstances in his case, his sentence was excessive. In this regard, the entirety of his attempt to argue that his circumstances justify setting aside his sentences consists of a couple of conclusory sentences that assert that "some of the factors that made consecutive sentences unreasonable in *Strunk* and *Galli*," such as a "relatively minor" criminal history, voluntary confession, and expressed commitment to improve, are present in his case. And he does not argue that the district court failed to consider the required factors or that his sentence exceeded "legally prescribed limits." *See State v. Daniels*, 2014 UT App 230, ¶ 7, 336 P.3d 1074. Accordingly, Gray has not provided a basis in the circumstances of his case to support a conclusion that his sentence exceeded the district court's discretion.

¶46　We also question whether Gray would have been able to successfully carry his burden of persuasion here in any event, given the evidence before the district court. *See* Utah Code Ann. § 76-3-401(2) (LexisNexis 2012). It appears that there was substantial evidence supporting the district court's findings on every consecutive sentencing factor under section 76-3-401—the "gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant"—with little to no mitigating evidence. And, given the egregious nature Gray's offenses, the evidence suggests that consecutive sentencing was appropriate. Gray

committed his offenses hundreds of times over a decade on more than one victim, and he took advantage of the vulnerability of the victims and his position of special trust to emotionally manipulate and, at times, physically coerce them to comply with his sexual demands—a pattern of conduct which the district court concluded would burden the victims for the rest of their lives.

¶47 Further, the kind of mitigating evidence present in the cases Gray chiefly relies on—*Smith*, *Strunk*, and *Galli*—does not exist here. For example, unlike in *Smith* and *Strunk* where it seemed significant that the crimes were committed in a single criminal episode and involved one victim, Gray's conduct involved hundreds of criminal episodes and more than one victim. And unlike in *Galli*, where the defendant's prior criminal history was minor, he voluntarily confessed, and he had proven a potential for rehabilitation, Gray's prior criminal history includes offenses, such as assault and lewdness, that suggest a relationship to the offenses for which he was sentenced, and his current offenses came to light only through the rather extraordinary initiative of one of his victims. Further, Gray persisted in the conduct for a decade despite his victims' pleas to desist. And unlike in *Strunk*, where the defendant's "extreme youth" suggested cause for leniency in sentencing, because Gray is middle-aged, his case is more similar to the circumstances in *State v. Nuttall*, 861 P.2d 454 (Utah Ct. App. 1993), where we concluded that the defendant's comparatively advanced age actually exacerbated his culpability and decreased his potential for rehabilitation. *Id.* at 457.

¶48 In affirming Gray's sentence, we recognize that the cost to Gray is significant; he may well spend the remainder of his life in prison. But given the statutory requirements in Utah Code section 76-3-401, the reasoning of our prior case law, the Board's enhanced authority to exercise its discretion to release an offender who has not served the minimum mandatory sentence, and the circumstances of his crimes, we are not persuaded that

the district court abused its sentencing discretion by placing Gray in a situation where only future mitigating circumstances will justify his release.

CONCLUSION

¶49 We affirm. Gray has failed to show that the district court committed plain error by failing to recognize the State's alleged breach of the plea agreement. And in light of the circumstances of his crimes and the other factors bearing on the decision to impose consecutive sentences in this case, we are not persuaded that the district court abused its discretion when it sentenced Gray to consecutive sentences on all counts.

———————

VOROS, Judge (concurring):

¶50 I concur in the judgment of the majority opinion and I concur in the opinion itself except as to paragraph 44 and Part II.B.

¶51 First as to paragraph 44. I do not agree that, in addition to the statutory sentencing factors in Utah Code section 76-3-401, a court contemplating the imposition of consecutive sentences needs to "keep in mind" the Board's role in determining the time an inmate actually serves. *See supra* ¶ 44. Our legislature has listed the factors a court contemplating consecutive sentences must consider: "In determining whether state offenses are to run concurrently or consecutively, the court shall consider the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant." Utah Code Ann. § 76-3-401(2) (LexisNexis 2012). So long as the court considers these factors, it complies with the statute. I see no basis for an additional requirement or suggestion that the sentencing court consider the Board's role in

monitoring an inmate's rehabilitative progress with the potential for early release in mind.

¶52   Of course the Board does serve that role. Current law authorizes the Board to release any offender sentenced to a felony on or after April 29, 1996. *See id.* § 77-27-9(1)(a). This authority extends to offenders serving minimum mandatory sentences:

> The board may not release any offender before the minimum term has been served unless the board finds mitigating circumstances which justify the release and unless the board has granted a full hearing, in open session, after previous notice of the time and location of the hearing, and recorded the proceedings and decisions of the board.

*Id.* § 77-27-9(1)(b).[12] Thus, the Board *by statute* holds the authority, on stated conditions, to release an offender before the expiration of a minimum mandatory sentence. This sentencing arrangement leaves no room "for a sentencing court to take into account . . . whether a particular consecutive sentencing decision may unduly 'invade[] the province' of the Board's parole authority." *Supra* ¶ 44 n.11. No court's consecutive sentencing decision can invade the authority the legislature has explicitly granted to the Board in subsection 77-27-9(1).

¶53   As I see it, that subsection codifies the principle at the core of the *Strunk/Smith/Galli* line of cases. In *Strunk*, the court vacated a sentence of consecutive minimum terms totaling 24

---

12. An amendment to section 77-27-9(1)(b) effective May 1, 1995, extended the Board's authority to grant release on parole to persons sentenced after May 1, 1995 to minimum mandatory sentences for certain enumerated crimes against children. Act of Mar. 1, 1995, ch. 337, § 2, 1995 Utah Laws 1274, 1276.

years on the ground that it "robs the Board of Pardons of any flexibility to parole Strunk sooner." *State v. Strunk*, 846 P.2d 1297, 1301 (Utah 1993). The current subsection 77-27-9(1) restores the Board's flexibility to release an offender before the expiration of his consecutive minimum mandatory terms. In *Smith*, the court vacated a sentence of consecutive minimum terms totaling 60 years on the ground that "[t]he Board is in a far better position than a court to monitor a defendant's subsequent behavior and possible progress toward rehabilitation while in prison and to adjust the maximum sentence accordingly." *State v. Smith*, 909 P.2d 236, 244 (Utah 1995). Again, subsection 77-27-9(1) grants the Board authority to adjust a maximum sentence in light of an offender's rehabilitative progress. Finally, in *Galli*, the court vacated a sentence of consecutive minimum terms totaling 15 years on the ground that the imposition of concurrent sentences "better serves Galli's rehabilitative needs by allowing the Board of Pardons and Parole to release him from prison after five years if he has shown genuine progress toward rehabilitation." *State v. Galli*, 967 P.2d 930, 938 (Utah 1998). Again, subsection 77-27-9(1) allows the Board to release, before the expiration of consecutive minimum mandatory terms, an offender who has shown genuine progress toward rehabilitation. Thus, in my view, *Strunk*, *Smith*, and *Galli* have not merely "been legislatively moderated," *see supra* ¶ 43, they have been superseded.

¶54   In sum, the current statutory scheme authorizes the sentencing court to sentence an offender to consecutive terms in compliance with section 76-3-401; it also authorizes the Board to release that offender before the expiration of those terms in compliance with subsection 77-27-9(1). I would say no more about it.

¶55   Second, I do not join in Part II.B of the opinion, because it responds to a claim that Gray does not assert. Gray does not assert a garden-variety excessive sentencing claim. He does not, for example, contend that "no reasonable judge would have entered such a sentence under the circumstances." *LeBeau v.*

*State*, 2014 UT 39, ¶ 75, 337 P.3d 254. Rather, he asserts a precisely focused *Strunk/Smith/Galli* claim. Here's how he frames it in his opening brief: "The district court abused its discretion in imposing consecutive sentences in a manner that deprived the Board of Pardons of discretion to take into account Gray's future conduct and possible progress towards rehabilitation." And here's how he summarizes it in his reply brief: "Gray's opening brief argues that the trial court abused its discretion by imposing consecutive sentences in a manner that deprived the Board of Pardons of discretion to release Gray during his lifetime." In short, as the majority recognizes, Gray does not attempt to show that his sentence is "'clearly excessive' in some other way." *Supra* ¶ 45.

¶56   We dispose of Gray's *Strunk/Smith/Galli* claim in Part II.A of this opinion. Our analysis should end there. I see no purpose in pondering "whether Gray would have been able to successfully carry his burden of persuasion" on another claim he does not in fact assert. *See supra* ¶ 46. That he does not assert it speaks volumes.

————————