2017 UT App 7

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DONALD S. NEILSON,
Appellant.

Memorandum Decision
No. 20140111-CA
Filed January 12, 2017

Eighth District Court, Vernal Department
The Honorable Edwin T. Peterson
No. 121800664

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes, Laura B. Dupaix, and Jeffrey S. Gray,
Attorneys for Appellee

JUDGE KATE A. TOOMEY authored this Memorandum Decision, in
which JUDGES STEPHEN L. ROTH and DAVID N. MORTENSEN
concurred.

TOOMEY, Judge:

¶1     Donald S. Neilson was convicted of three counts of aggravated sexual abuse of a child, and one count of sodomy on a child, *see* Utah Code Ann. §§ 76-5-404.1(4), -403.1 (LexisNexis Supp. 2016), all first degree felonies. Neilson contends the district court erred in denying his motion for a mistrial and in failing to sua sponte direct a verdict on all counts. Neilson also argues the district court abused its discretion in ordering his prison sentences to run consecutively. We affirm.

## BACKGROUND[1]

¶2     Sometime in late 2009 or early 2010, Neilson became friends with R.S. (Father) and five-year-old C.S. (Child). Father was intermittently out of work and sometimes stayed with Child's mother (Mother) and sometimes with Neilson. Father and Child occasionally stayed with Neilson for several days at a time. In the summer of 2012, when Child was eight years old, she disclosed to her grandmother that Neilson had touched her inappropriately. Child eventually told Father, and Father called the authorities. A police officer (Officer) interviewed Child.

¶3     In the interview, Child stated that Neilson touched her inappropriately on three different occasions. The first instance occurred when she and Father were staying at Neilson's house overnight. Father was sleeping in the living room, and Child went into Neilson's room to avoid Father's snoring. Child went to sleep but awakened to find her pants and underwear pulled down to her knees and "something touching [her] private." She saw that it was Neilson. Child tried "to get him away," but he would not leave her alone. Neilson asked her if she wanted him to stop and Child said, "yes," but Neilson "started to do it a little bit more." When asked what Neilson was doing, Child responded, "He was touching outside of my private and inside."

¶4     On another occasion, Child was with Neilson at his house and Neilson took her into the living room and had her sit on his lap. He unbuttoned her pants, took down her underwear, and touched her "privates."

---

1. "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. We recite the facts accordingly, and present conflicting evidence only to the extent necessary to understand the issues raised on appeal." *State v. Dunn*, 850 P.2d 1201, 1205–06 (Utah 1993) (citations omitted).

¶5    Child said that about a week later she was on Neilson's bed and he touched her with his hand and that "the worst part" was when "[h]e licked [her] privates." Child was lying on the bed, Neilson was standing, and he licked the "inside" of her "privates." Child also said Neilson used a video camera on this occasion.

¶6    After interviewing Child, Officer obtained search warrants for Neilson's house, storage unit, and vehicle. A camera was found in Neilson's vehicle but no corroborating photographs or video footage was discovered. Officer contacted Neilson, but Neilson declined to speak with him.

¶7    Neilson was charged with three counts of aggravated sexual abuse of a child, and one count of sodomy on a child.[2] A jury trial was held in September, 2013. Officer, Child, Mother, Father, and the investigator all testified at trial and a video recording of Officer's interview with Child was played for the jury.

¶8    During direct examination, the prosecutor (Prosecutor) asked Officer if he contacted Neilson during his investigation. Officer stated that he had contacted Neilson, but that Neilson declined to speak with him. After Officer testified, and out of the presence of the jury, Neilson moved "for a mistrial based on prosecutorial misconduct." Neilson argued that Prosecutor inappropriately focused the jury's attention on Neilson's refusal to talk with Officer and that the jury would therefore draw "a negative inference." The court denied the motion but gave the jury a curative instruction that it should "take no negative implication" from the fact that Neilson did not speak with Officer and to give his refusal "no weight whatsoever in [its] deliberations."

---

2. Neilson was also charged with one count of sexual exploitation of a minor, a second degree felony, but this charge was dismissed at trial for lack of evidence.

¶9    At trial, Father testified that he and Neilson were good friends for about three years. They celebrated birthdays and holidays together and "felt like family." When Father stayed at Neilson's house, Child stayed with him, and the two slept in the living room. Father testified that he sometimes left Child alone with Neilson at Neilson's house. Father said that Neilson was "very affectionate" and that Father once got upset with Neilson for giving Child a "[q]uick kiss on the lips."

¶10    Neilson also testified at trial. He confirmed that he and Father were friends for three years, that Father and Child often stayed at his house for "three or four nights in a row or a week," and that Neilson sometimes assisted Father financially. Neilson denied ever having been alone with Child at his house. He stated that he had "never touched [Child] inappropriately."

¶11    Although several witnesses testified, no one at trial pointed to Neilson and identified him by name.

¶12    The jury convicted Neilson of three counts of aggravated sexual abuse of a child and one count of sodomy upon a child. The district court sentenced him to fifteen years to life in prison for each count of aggravated sexual abuse of a child and twenty-five years to life for the sodomy count. The court ordered all of the sentences to run consecutively, for a total of seventy years to life. Neilson appeals.

ISSUES AND STANDARDS OF REVIEW

¶13    Neilson raises three issues on appeal. First, he contends the district court "erred in denying [Neilson's] motion for mistrial when the State elicited evidence that [Neilson] declined to be interviewed by law enforcement." "We review rulings on motions for a mistrial based on prosecutorial misconduct for abuse of discretion." *State v. Reed*, 2000 UT 68, ¶ 18, 8 P.3d 1025.

¶14    Second, Neilson contends the court "erred in not sua sponte directing a verdict on all [c]ounts" in Neilson's favor

because "the State neglected to have any witness identify [Neilson] in the courtroom as the perpetrator of any of the charged offenses." "To prevail on a claim that the district court erred in failing to sua sponte order a directed verdict, [a defendant] must demonstrate that the district court committed plain error." *State v. Atencio*, 2005 UT App 417U, at para. 2 (per curiam) (citing *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993)).

¶15  Third, Neilson contends the court "erred in imposing sentences which result in a de facto life sentence due to [Neilson's] age." "Because trial courts are afforded wide latitude in sentencing, a court's sentencing decision is reviewed for an abuse of discretion." *State v. Epling*, 2011 UT App 229, ¶ 8, 262 P.3d 440 (citations and internal quotation marks omitted). "A court exceeds its discretion if it acts with inherent unfairness in imposing a sentence, imposes a clearly excessive sentence, or fails to consider all legally relevant factors." *Id.*

ANALYSIS

I. Mistrial Motion

¶16  Neilson first argues the court erred in denying his motion for a mistrial. "[T]he trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate . . . that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." *State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (omission in original) (citation and internal quotation marks omitted). "Unless the record clearly shows that the trial court's decision is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion." *Id.* (citation and internal quotation marks omitted).

¶17  Neilson contends Officer's statement that Neilson declined to speak with him during the investigation "impair[ed] the fundamental fairness of the proceeding" and was prohibited

by the Due Process Clause of the Fourteenth Amendment of the United States Constitution. However, Neilson concedes that, "[a]t least as it pertains to situations where the State has elicited information about a defendant's invocation of his right to remain silent, the mere mention of it is not sufficient to demonstrate a due process violation," rather, "the State must in some way use the silence to undermine the right to invoke." *See State v. Baker*, 963 P.2d 801, 806 (Utah Ct. App. 1998) ("[T]he mere mention that a defendant invoked his constitutional rights does not prima facie establish a due process violation. Rather, . . . the State must, in some way, use the defendant's silence to undermine the exercise of those rights guaranteed by the Fourteenth Amendment." (citations and internal quotation marks omitted)).

¶18     Here, Prosecutor elicited the following testimony from Officer during direct examination:

> [Prosecutor]: At any time during your investigation of this matter did you make contact with the defendant to ask him about these allegations that had been made against him?
> [Officer]: Yes, I did make contact with him.
> [Prosecutor]: Did he agree to speak with you?
> [Officer]: No, he did not.

Prosecutor never mentioned this again, much less "made use" of this information in any way, and the court gave a curative instruction to address any "negative inference" the jury may have made of this isolated statement.

¶19     Further, Neilson has not argued, or shown, "the incident so likely influenced the jury that [he] cannot be said to have had a fair trial." *See Butterfield*, 2001 UT 59, ¶ 46 (citation and internal quotation marks omitted). We therefore conclude that the district court did not abuse its discretion in denying Neilson's motion for a mistrial.

## II. Directed Verdict

¶20    Neilson next contends the district court should have sua sponte directed a verdict on all counts because "the State neglected to have any witness identify [him] in the courtroom as the perpetrator of any of the charged offenses." To succeed on this claim, Neilson "must demonstrate that the district court committed plain error." *State v. Phillips*, 2006 UT App 211U, para. 1 (citing *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993)). "[T]o establish plain error, a defendant must demonstrate first that the evidence was insufficient to support a conviction of the crime charged and second that the insufficiency was so obvious and fundamental that the trial court erred in submitting the case to the jury." *State v. Holgate*, 2000 UT 74, ¶ 17, 10 P.3d 346.

¶21    Neilson argues that failing to direct a verdict was error because identification is a crucial element to be proven in every criminal case and that "'a defendant cannot be convicted of a crime except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" (Quoting *State v. Ellis*, 2014 UT App 185, ¶ 17, 336 P.3d 26.)

¶22    But "identification can be inferred from circumstantial evidence; therefore, direct, in-court identification is not required." *State v. Isom*, 2015 UT App 160, ¶ 23 n.2, 354 P.3d 791 (citation and internal quotation marks omitted). In this case, the identity of the perpetrator was never an issue at trial. Child told the interviewer that "Don" was the one who had abused her and that he was a friend of Father's. Neilson's identity as the perpetrator was further corroborated by Father's testimony and the testimony of Neilson himself. Both testified that Father and Neilson had been good friends for several years and that Father and Child stayed at Neilson's house for several days at a time on multiple occasions. There was never any suggestion that the abuse may have been perpetrated by someone else. We conclude there was sufficient circumstantial evidence of Neilson's identity as the perpetrator of the crimes charged and the district court

therefore did not err in not directing a verdict in Neilson's favor.[3]

## III. Sentence

¶23 Finally, Neilson contends the court "erred in imposing consecutive sentences which result in a de facto life sentence due to [his] age." "We will not overturn a sentence unless a trial court has abused its discretion, failed to consider all legally relevant factors, or imposed a sentence that exceeds legally prescribed limits." *State v. Gray*, 2016 UT App 87, ¶ 23, 372 P.3d 715 (citation and internal quotation marks omitted). "In determining whether state offenses are to run concurrently or consecutively, the court shall consider the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant." Utah Code Ann. § 76-3-401(2) (LexisNexis 2012).

¶24 Neilson contends the court erred because it did not consider all of the required statutory factors for sentencing; specifically, he argues the court failed to consider his history of minimal criminal involvement or his rehabilitative needs or character. But Neilson does not support his contention. Instead, he implies that because the court did not make specific findings on these factors, it did not consider them. "[A]s a general rule this court upholds the trial court even if it failed to make findings on the record whenever it would be reasonable to

---

3. Neilson also states that the court indicated that identification was going to be required and implies that this statement was in reference to Neilson. But this is not the case. After Child's interview with Officer was played for the jury, the court told Prosecutor, "I'll require you . . . to call [Child] as your witness, ask her her name— . . . age, whatever. You don't have to ask questions, but you have to identify the individual." This mandate to "identify the individual" refers to Child, not Neilson.

assume that the court actually made such findings."[4] *State v. Helms*, 2002 UT 12, ¶ 11, 40 P.3d 626 (citation and internal quotation marks omitted). "[W]e will not assume that the trial court's silence, by itself, presupposes that the court did not consider the proper factors as required by law." *Id.*

¶25    Further, contrary to Neilson's assertions, it appears from the record that the court did consider these factors. At sentencing, Neilson's counsel pointed out that Neilson "has never in his 54 years had any prior allegations or felony offenses other than the alcohol offenses . . . noted in the pre-sentence report, and certainly nothing of this nature." Counsel also stated that Neilson's employer and coworker "spoke very highly of him and also highly of his work ethic," and discussed Neilson's generosity and "strong support system" of family and friends. In addition, Adult Probation and Parole submitted a presentence report to the court that summarized, among other things, Neilson's criminal history, employment and education history, financial circumstances, alcohol use, and emotional and mental stability. As Neilson acknowledges, he bears the burden to demonstrate the district court "did not properly consider all the [statutory] factors." *Helms*, 2002 UT 12, ¶ 16. He has failed to carry his burden.

¶26    Neilson also seems to argue the district court abused its discretion by ordering his sentences to run consecutively because this "result[s] in a de facto life sentence due to [Neilson's] age." But this, by itself, does not demonstrate an abuse of discretion. Our sentencing scheme allows for consecutive sentences, Utah Code Ann. § 76-3-401(2) (LexisNexis 2012), and this court has determined that "it is not a per se abuse

---

4. This assumption should not be made, however, "where (1) an ambiguity of facts makes the assumption unreasonable, (2) a statute explicitly provides that written findings must be made, or (3) a prior case states that findings on an issue must be made." *State v. Helms*, 2002 UT 12, ¶ 11, 40 P.3d 626.

of discretion to impose lengthy consecutive sentences." *Gray*, 2016 UT App 87, ¶ 45; *see also id.* ¶¶ 24–44 (determining that consecutive sentencing that resulted in "no reasonable probability that [the defendant would] live to be paroled" was not an abuse of discretion). Rather, Neilson "must demonstrate that his sentence is 'clearly excessive' in some other way." *See id.* ¶ 45. But Neilson merely asserts that the consecutive sentences are an abuse of discretion and he does not support this contention. "[H]e has not attempted to demonstrate that his sentence exceeded the bounds of the court's discretion."[5] *See id.*

---

5. Notably, in the little more than two pages Nielson devotes to the issue, he fails to even cite to the Utah Supreme Court's decisions in *State v. Galli*, 967 P.2d 930 (Utah 1998), *State v. Smith*, 909 P.2d 236 (Utah 1995), and *State v. Strunk*, 846 P.2d 1297 (Utah 1993), three cases that address core concerns about the bounds of district court discretion in imposing consecutive sentences. Although those cases have been distinguished in light of subsequent legislation that accords discretion to the Board of Pardons and Parole to parole defendants before the expiration of the minimum mandatory component of a prison sentence, the underlying principles retain significance in the sentencing process. *See State v. Gray*, 2016 UT App 87, ¶ 44, 372 P.3d 715 ("Thus, the lesson of the *Smith/Strunk/Galli* line of cases remains valid—that is, although the statutory context implicating the relationship of consecutive sentencing and the Board's authority to parole has changed, courts should still keep in mind the central role that the Board's parole authority continues to play in our indeterminate sentencing scheme when considering whether to impose sentences consecutively."). But the burdens of adequate briefing lie with the parties, and we cannot take on the role of an advocate ourselves where that burden is not met. *See Broderick v. Apartment Mgmt. Consultants, LLC*, 2012 UT 17, ¶ 9, 279 P.3d 391 ("We will not assume a party's burden of argument."). While we cannot say the result on appeal would necessarily be different, the lack of meaningful analysis is troubling.

Accordingly, we are not persuaded that the court abused its discretion in ordering Neilson's sentences to run consecutively.[6]

---

6. It is possible that the court and the parties misunderstood the sentencing statute with regard to consecutive sentencing. At the sentencing hearing, the State highlighted, and Neilson acknowledged, that section 76-3-401(3) states, "The court *shall* order that sentences for state offenses run consecutively if the later offense is committed while the defendant is imprisoned or on parole, unless the court finds and states on the record that consecutive sentencing would be inappropriate." *See* Utah Code Ann. § 76-3-401(3) (LexisNexis 2012) (emphasis added). The State argued that consecutive sentences would not be inappropriate given the serious nature of the offenses and Neilson's supervision history while on parole for a previous offense. It appears the State understood section 76-3-401(3) to require that Neilson's sentences for his current convictions run consecutively. But the statute merely requires that if a defendant commits a crime while already on parole for a previous crime, the subsequent sentence will run consecutively to the sentence *currently being served*. *See State v. Perkins*, 2014 UT App 60, ¶ 12 n.2, 322 P.3d 1184 (stating that because the defendant was on parole "at the time the offenses were committed, the trial judge was required to run the new sentences consecutively to the older sentence unless the judge specifically made a finding that consecutive sentencing would be inappropriate" (citation and internal quotation marks omitted)). It is possible the court may have accepted the State's reading of the statute, but it is not clear from the record that the court applied it other than to run the sentences in this case consecutively to the sentence Neilson was already serving from a prior case. In pronouncing the sentence, the court stated, "[U]nless it is inappropriate, the Court would be bound to a 25 to life sentence. I received no information that not only would that not be fully appropriate, but nothing that would suggest it's inappropriate. You were a convicted felon when these occurred." The district court concluded, "I don't

(continued…)

CONCLUSION

¶27　We conclude the district court did not err in denying Neilson's motion for a mistrial or in failing to direct a verdict on the counts charged against him. In addition, Neilson did not meet the burden required to show the district court abused its discretion in ordering Neilson's sentences to run consecutively.

¶28　Affirmed.

––––––––––

(…continued)
think there's any act you could perpetrate that would be more violative of societal interests at this point in time. So I am going to sentence you to 15 to life on Counts I, II and III consecutively, and 25 to life on Count IV." It ordered that those sentences "be consecutive with any other sentences existing in the State of Utah or any other State." In his brief, Neilson asserts the State "misstated the statute" at the sentencing hearing. Neilson points to the State's argument, "[T]he Court should sentence him consecutively in these matters. I don't believe that there is reason for the Court to find that it would be inappropriate to do so when the statute says 'shall, unless,' and there's no glaring reason why it would be inappropriate." Neilson asserts this is a misreading of the statute because "[t]he statute does not speak to glaring reasons." Neilson thus seems to argue that the State expands "inappropriate" to "glaring reasons." But Neilson does not argue that the court misapplied the statute and, although we are concerned about the outcome of this case, "[w]e will not assume a party's burden of argument." *Broderick*, 2012 UT 17, ¶ 9.