STATE of Utah, Plaintiff and Appellee,

v.

Stanley Allen SMITH, Defendant and Appellant.

No. 940187.

Supreme Court of Utah.

Dec. 20, 1995.

---

8. In fact, defendants do not even reference the district court's factual findings in relation to this issue.

Jan Graham, Att'y Gen., J. Frederic Voros, Jr., Asst. Att'y Gen., Salt Lake City, for plaintiff.

Kent E. Snider, Michael D. Bouwhuis, Ogden, for defendant.

STEWART, Associate Chief Justice:

Stanley Allen Smith was convicted of aggravated kidnapping, rape of a child, and two counts of sodomy on a child, all of which are first degree felonies. The trial judge imposed the greatest minimum mandatory sentence of fifteen years with a maximum of life imprisonment on each count, *see* Utah Code Ann. § 76–3–201(7)(c), and ordered the sentences to run consecutively. Smith argues that the trial court erred (1) in admitting the victim's hearsay statements to a child abuse investigator and police officer under the excited utterance exception to the hearsay rule and (2) in admitting testimony connecting him to the victim through DNA evidence. In addition, he argues that (3) his counsel was ineffective in failing to engage a DNA expert for the defense and (4) the trial court erred in imposing the greatest minimum sentence for each offense and ordering that the sentences run consecutively.

On May 8, 1993, a six-year-old girl was abducted at knife point from her neighborhood in Corinne, Utah, forced into a car,

taken to another place, and raped and sodomized. She was found by neighbors about an hour after disappearing and taken to a hospital, where she was questioned by LuEllen Brown, a child abuse investigator, while a physician was conducting a physical examination of the victim. At that time, some one to two hours after being found, she was still bleeding from the injuries suffered during the assault, in pain, crying, and very upset. She told the investigator that a man had driven her to a dirt road, raped and sodomized her, and returned her to Corrine. She described his clothing and his car, including some of its contents. The victim also described the cause of her injuries to the examining physician, the police, and the neighbors who found her. It was obvious from the medical examination that she had suffered physical injuries caused by rape and sodomy. It took more than an hour of surgery to repair some of the physical injuries.

Approximately two days after the attack, Keith Brady, a family friend and an Ogden City police officer, interviewed the victim in the hospital. At that time, she was still emotionally detached and in something of a dissociative state, suffering from "psychic shock," and was "just kind of far away from herself." Although reluctant to talk, she stated that she had been taken to a dirt road where the car got stuck and a truck had pulled the car out. At trial, the social worker and the police officer testified to the victim's statements under the excited utterance exception to the hearsay rule.

On the basis of information given by the victim, the investigation focused on defendant. Various items of physical evidence confirmed the victim's story. Fibers on the victim's clothing matched fibers in Smith's shirt and in the carpet of his car. Pubic hair matching defendant's was found on the victim, and head hairs consistent with the victim's were found in defendant's back seat. Blood of the victim's type (eighteen percent of the population) and semen of defendant's type (two percent of the population) were found on the back seat of his car. In addition, a witness testified that during the time of the victim's abduction, he encountered Smith, whose car was stuck alongside a dirt road, and saw a young girl in Smith's car when he pulled it out of the mire. A criminologist assigned to the serology DNA section of the State Criminal Forensics Laboratory testified to a DNA match. He stated that the blood in the vehicle matched the victim's and was inconsistent with defendant's. He concluded that the random probability of the match was, by conservative estimates, about one in fourteen thousand.

## I. EXCITED UTTERANCE EXCEPTION TO THE HEARSAY RULE

Out-of-court declarations offered for the truth of the matter asserted are inadmissible as hearsay unless they fit within one of the established exceptions to the hearsay rule. Utah R.Evid. 801–803. Exceptions to the hearsay rule are based on factors that provide assurances of testimonial reliability sufficient to dispense with the usual means of purging testimony of error and falsehood, i.e., the oath, cross-examination, and the trier of fact's assessment of the declarant's veracity.

Rule 803(2) establishes the "excited utterance" exception to the hearsay rule and defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Under this exception, three conditions must be met to allow an out-of-court excited utterance into evidence. *State v. Cude*, 784 P.2d 1197, 1200 (Utah 1989). First, an "event or condition" must occur that is sufficiently startling to cause an excitement that stills normal reflective thought processes. Second, the declarant's declaration must be a spontaneous reaction to the event or condition, not the result of reflective thought. Third, the utterance must relate to the startling event. *Id.; see also State v. Thomas*, 777 P.2d 445, 449 (Utah 1990).

The generally accepted rationale for the exception is that declarations made during a state of excitement temporarily still a declarant's capacity to reflect and thereby produce

utterances free of conscious fabrication.[1] *Cude*, 784 P.2d at 1199–1200; *see also* John W. Strong et al., *McCormick on Evidence* § 272 (4th ed. 1992).

Usually the most difficult issue in determining the admissibility of an excited utterance is whether the statement was uttered with a spontaneity produced by emotional excitement to a degree that provides a warrant of trustworthiness. The determination requires an evaluation of a variety of factors, including the nature of the startling event and the intensity of the excitement or other emotional effect on the declarant.[2] The statement need not be strictly contemporaneous with the startling event to be spontaneous, as is the case with the "present sense impression" exception, *see* Rule 803(1), but the justification for the exception disappears as the emotional excitement of the declarant subsides and the declarant's capacity for reflection revives. Thus, although the utterance need not be contemporaneous with the event, temporal proximity is a factor to be considered. *State v. Wetzel*, 868 P.2d 64, 69 (Utah 1993).

It is not enough, however, to meet the requirements of the exception that a declarant merely be subject to a degree of aroused emotion produced by the startling event when a hearsay declaration is made. Some emotional states, such as fear, embarrassment, and shock, that are produced by a traumatic event may have a long-term, even a lifetime, emotional impact of some degree, but attenuated, lingering after-effects of shock, excitement, or fear cannot justify the admission of an out-of-court declaration made long after a startling or traumatic event. Statements made in such circumstances have no greater warrant of reliability than hearsay statements generally.

In short, the determinative factor, subject to no precise or absolute standard, is whether the state of the declarant's mind was such that because of a high degree of emotional arousal, the declaration was spontaneous in the sense that the declarant's emotional arousal or excitement at the time of the statement strongly suggested that the statement came purely from the declarant's memory, unchanged or distorted by a consideration of the consequences of the statement. " 'The crucial question ... is whether the declarant was still under the influence of the event to the extent that his statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.' " *Thomas*, 777 P.2d at 449 (quoting *Johnston v. Ohls*, 76 Wash.2d 398, 457 P.2d 194, 199 (1969)). As is clear from the facts in *Cude*, intervening actions may strongly suggest that a declarant's statements are untrustworthy. *Cude*, 784 P.2d at 1200. In assessing a declarant's state of mind, therefore, it is necessary to consider the likely effects of the declarant's age, the declarant's physical and mental condition, the circumstances and nature of the startling event, the subject matter of the statement, and the time lapse between the event and the utterance. *United States v. Moses*, 15 F.3d 774, 777–78 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2691, 129 L.Ed.2d 822 (1994).

Even though excitement may in some instances distort a person's perception or other

---

1. *McCormick on Evidence* states:

> The entire basis for the exception is, of course, subject to question. While psychologists would probably concede that excitement minimizes the possibility of reflective self-interest influencing the declarant's statements, they have questioned whether this might be outweighed by the distorting effect of shock and excitement upon the declarant's observation and judgment. Despite these questions concerning its justification, however, the exception is well established.

John W. Strong et al., *McCormick on Evidence* § 272 (4th ed.1992). *See generally* I. Daniel Stewart, *Perception, Memory, and Hearsay: A Criticism of Present Law and the Proposed Federal Rules of Evidence*, 1970 Utah L.Rev. 1 (reporting psychological studies of accuracy of memory and perception).

> In addition to the effect of excitement in distorting perception and memory, at least in some cases, a number of other factors are peculiar to any particular declarant that can unintentionally distort a declaration, such as a strong propensity to project blame onto others or to assume blame oneself as a result of a guilt prone personality.

2. The exception is usually said to require "excitement" on the part of the declarant. But that term must be given a broad meaning to include any aroused emotional state that is likely to still reflective capacity, such as fear and shock.

cognitive powers that affect the accuracy of a person's statements,[3] it is, nonetheless, generally true that excited utterances are likely to have greater evidentiary value to a trier of fact than in-court statements to the same effect. In holding that the excited utterance exception does not violate the federal Confrontation Clause, Chief Justice William Rehnquist made that point for the Court in *White v. Illinois*, 502 U.S. 346, 355–56, 112 S.Ct. 736, 742–43, 116 L.Ed.2d 848 (1992):

> But those same factors that contribute to the statements' reliability cannot be recaptured, even by later in-court testimony. A statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom.

■ Smith challenges the admissibility of the out-of-court statements made by the victim to LuEllen Brown, the child abuse investigator, and Officer Keith Brady, a family friend, on the ground that they did not meet the requirements of an excited utterance. In particular, Smith argues that the victim's statements were not uttered under the stress of the event because of the time lapse between the assault and her statements to LuEllen Brown, some two to three hours after the assault, and her statements to Keith Brady, some thirty-eight hours later. Defendant asserts that the victim's apparent lack of emotion in her responses in both instances and Brady's somewhat leading questioning of the victim demonstrate that the victim's declarations do not meet the requirements of the excited utterance exception.

*A. Victim's Statements to LuEllen Brown*

We analyze the victim's statements to Brown and Brady separately. The victim's account of the assault was made to Brown about two hours after the victim was found and probably less than three hours after the assault. She was only six years old, and when describing the events that had transpired, she was bleeding, in pain, and described as being in a state of "psychic shock" as evidenced by her emotional withdrawal and detachment—indeed, an almost dissociative state. Her physical injuries were serious enough to require an hour in surgery to repair. Given the overpowering emotional trauma and the significant physical injuries caused by the assault, the victim's statements to LuEllen Brown, notwithstanding the two-to three-hour time lapse, clearly evidenced a spontaneity prompted by a continuing aroused mental state that precluded the likelihood of intentional fabrication and made highly unlikely any unintentional distortion, especially in view of her age. Moreover, her statements were made by free recall in response to very open-ended questions. In addition, the facts she stated were corroborated in every essential respect. In sum, her statements had every indicium of being an accurate representation of her recall of events occurring shortly before. The trial judge was clearly correct in admitting these statements.

■ Smith argues that the victim's withdrawn demeanor indicates that she was not in a state of excitement. In a narrow meaning of the word "excitement," that may be true. But the word "excitement" should not be so narrowly construed. As indicated, what is critical is a mental state that tends to block reflection and the reasoning process. That surely occurred here. The victim's emotional withdrawal into an almost dissociative state was likely caused by overwhelming feelings of pain, guilt, fear, anxiety, and other powerful emotions. In this instance, her emotional withdrawal evidenced an even greater warrant of reliability than a short and temporary excitement giving rise to manifest physical agitation, such as has been held sufficient in many cases. Certainly one need not be hysterical for the exception to apply. *State v. Kaytso*, 684 P.2d 63, 64 (Utah 1984).

---

**3.** *See supra* note 1.

## B. Victim's Statements to Keith Brady—Minority Opinion [4]

The admissibility of the statements the victim made to Keith Brady approximately a day and a half after the assault present a much closer question. He visited her in the hospital the second morning after the assault. The victim had been hospitalized the previous day and had been essentially non-communicative from that time until her interview with Brady. She refused to make eye contact with others and was still in pain. When Brady talked with her, she was still withdrawn and still in a state of "psychic shock."

The testimony of the victim's attending physician at the hospital (who also performed the surgery on her the night of May 8) demonstrates that the sexual assault and kidnapping at knife point had a continuing, powerful effect on the victim's state of mind from the time she came into the hospital through the morning of May 10, when Brady talked with her. The physician testified that when the victim came into the emergency room on the 8th, she was "totally detached from what had happened to her." He stated, "It surprised me she described in great detail what had happened, which most little girls don't do. Most children can't do that. And she allowed me to examine her almost as though she were in no pain." *She was talking "as though she were someone else talking about something that had happened to someone totally different than she was. This gradually resolved through her hospital stay through a point of almost terror."* With respect to what happened on the 10th, the day of the interview, the doctor stated that while he could not attribute what happened on the 10th to post-traumatic stress, he could "certainly attribute anything that happened on the 10th to the psychological shock of the injury." The doctor further testified that "all the way through her hospitalization, she was under a tremendous amount of stress and psychological shock, I guess you could put it."

In addition, a licensed clinical social worker who interviewed the victim on the night of the 8th and saw her in therapy on the 12th testified that during this period, a person such as the victim, to whom something "so horrendous as this" happens "can disassociate during periods of time in order to cope." A number of other statements in the record also establish the great intensity and duration of the psychological shock that was largely peculiar to the victim.

To facilitate communication with the victim, Brady played a card game with her, during which she became more responsive.[5] She stated that her assailant's car had been stuck on a dirt road and pulled out by a truck. Given the highly traumatic assault, both physically and emotionally, as evidenced in part by the fact that the victim was not communicating with others except to ask for pain pills, and given the nature of the statements she made to Brady, we think the trial judge acted within his discretion in admitting the statements.[6]

4. Justice Durham concurs in this portion of the opinion. Justice Howe dissents from this portion of the opinion and holds that the statements made to Keith Brady are inadmissible but that their admission was harmless error. Chief Justice Zimmerman and Justice Russon concur in Justice Howe's opinion. *See infra.* Justice Howe's opinion on the statements made by the victim to Keith Brady is therefore the opinion of the Court on that point.

5. The game was a memory game that was based on matching a face-up playing card with cards lying face down. The game had nothing to do with the events of the crime.

6. Justice Howe's opinion argues that the statements made by the victim to Keith Brady were too remote in time from the victim's injury to qualify as an excited utterance. First, it should be noted that the leading authorities hold that "there can be no definite and fixed limit of time. Each case must depend upon its own circumstances." 6 John H. Wigmore, *Wigmore on Evidence* § 1750 (1976); *see also McCormick on Evidence* § 272. Second, Justice Howe does not refer to the testimonial foundation that the prosecution established for the admission of Brady's statements. Although a thirty-six-hour lapse is a long time, the facts indicate that, owing to the violence of the attack and the specific psychological response of the six-year-old victim, this is an exceptional case where the traumatic effects of the assault persisted for an atypically long time. As a result, this case falls within the discretion afforded to the trial judge in admitting or rejecting evidence under the excited utterance exception.

Though somewhat leading, Brady's questions were far from coercive.[7] An excited utterance made in response to a somewhat leading question does not necessarily make the declaration inadmissible, although surely that fact must be carefully evaluated in determining admissibility. *State v. Kaytso,* 684 P.2d 63, 64 (Utah 1984). In this case, there is no reason to believe that the victim's responses were anything other than an accurate report of her memory of very recent events that were accurately perceived.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

 Defendant next asserts that his counsel was constitutionally ineffective because he did not call an expert witness to rebut the State's DNA evidence connecting him to the victim. To show ineffective assistance of counsel under the standards in *State v. Templin,* 805 P.2d 182, 186 (Utah 1990), a defendant must show (1) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) that but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different. *See also Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

Assuming but not concluding that Smith's attorney's performance was deficient, Smith's argument fails because there is no reasonable probability that the outcome of the trial would have been different if the attorney had called an expert. There is highly compelling evidence of Smith's guilt even without the DNA evidence. The victim gave an accurate description of Smith's clothing, the color and type of his car, and its contents, including an unusual item. Physical evidence was also highly incriminating. Fibers matching the fibers in Smith's shirt and in the carpet of his car were found on the victim's clothing. Pubic hair consistent with defendant's was found on the victim. Head hairs consistent with the victim's were found in the back seat of defendant's car. In addition, blood of the victim's type, which is found in eighteen percent of the population, and semen of defendant's type, which is found in two percent of the population, were found on the back seat of his car.

On these facts, we are persuaded that the jury would have found defendant guilty even without the DNA evidence.

## III. EVIDENTIARY OBJECTIONS

 Defendant attacks the admission of DNA evidence on the grounds that the State's expert was not qualified, the methodology was flawed, and the conclusions were without foundation. He also attacks the jury instruction concerning DNA evidence.

At trial, the only objection made to the DNA evidence was that "DNA testing has not been generally accepted by Utah courts." However, Smith does not now press the issue, and therefore, we do not address it.[8] As for Smith's claims that the State's DNA expert was not qualified, the methodology was flawed, the expert's conclusions were not supported, and the instruction to the jury was erroneous, those arguments are not based on any appropriate objections at trial.

 Smith argues, however, that his objection at trial to the admissibility of DNA evidence in general subsumed the evidentiary

---

7. Justice Howe's opinion criticizes Brady's method of obtaining statements from the victim. As stated in the opinion, Brady's questions were leading, but that is not unusual where a child is involved. The substance of his testimony was as follows:

> I asked her if she could remember going on a dirt road. And she said that she had. I asked if the vehicle that she was in, that the car they were in, if they had gotten stuck. And she said that they had. And I asked her how they were able to get out. At that point she said that another man came and pulled them out. I asked her how he pulled them out. She said with a tow truck. I asked her did she see the

> tow truck and she said no. I asked her if she saw the man. And she said that she had not. I asked her how the man knew to come and pull them out. And she said that the suspect— [objection follows].

8. This Court has never ruled on whether DNA evidence is sufficiently reliable to be admissible under the standards laid down in *Kofford v. Flora,* 744 P.2d 1343 (Utah 1987). Under *Kofford,* "new scientific evidence may be found reliable either under the general scientific acceptance test ... or under a broader test of inherent reliability." *Id.* at 1347–48.

issues he now seeks to raise. Although it is appropriate for a reviewing court to construe an objection to embrace issues reasonably included within the scope of the objection, an objection based on the reliability of a scientific principle that underlies a new forensic test does not include challenges to the qualifications of the expert, the appropriateness of the methodology, the validity of the expert's conclusions, or the jury instructions. We therefore address none of these issues because they have been waived. *State v. Brown*, 853 P.2d 851, 859 (Utah 1992).

## IV. WHETHER THE GREATEST MINIMUM MANDATORY SENTENCES SHOULD HAVE BEEN IMPOSED AND WHETHER THE SENTENCES SHOULD RUN CONSECUTIVELY

■ Finally, defendant argues that the trial court erred in (1) sentencing him to prison for the greatest minimum mandatory sentence allowed by law on each of the convictions, i.e., fifteen years and (2) ordering that the four sentences run consecutively, i.e., for a minimum mandatory sentence of sixty years, rather than concurrently.

■ To sentence a defendant to the greatest minimum mandatory sentence allowed by law, the trial court must set forth findings of fact showing aggravating circumstances with respect to the crime. In the case of child rape and child sodomy, the greatest minimum mandatory sentence is required if there is substantial bodily injury to the child. Utah Code Ann. § 76–3–201(7)(c), provided that "[i]f during the commission of a crime described as rape of a child ... [or] sodomy upon a child ... the defendant causes substantial bodily injury to the child ... the defendant shall be sentenced to the aggravated mandatory term in state prison."[9]

The trial court found that the victim suffered substantial bodily injuries. In addition, the trial court set out additional aggravating factors: the victim's vulnerability due to young age; the commission of multiple crimes; the use of a knife; and defendant's prior history of child sex abuse. On these facts, the trial court did not abuse its discretion in sentencing defendant to the minimum mandatory terms of fifteen years on each count.

■ Defendant also argues that the trial court abused its discretion in making the four sentences run consecutively. Under Utah Code Ann. § 76–3–401, the trial court may order sentences to run consecutively on the basis of "the gravity and circumstances of the offenses and the history, character, and rehabilitative needs of the defendant." The trial court found that the offenses were heinous crimes and that Smith was a pedophile. In addition, the court considered defendant's history, character, and rehabilitation possibilities. The court also found that Smith's victimization from abuse as a child was a mitigating factor but that Smith was responsible for his conduct and should have obtained help to cope with his problems.

■ An additional and highly important factor in deciding whether to impose consecutive or concurrent sentences is that the Legislature, in enacting indeterminate sentencing laws, has opted to give the Board of Pardons wide latitude in deciding what a maximum sentence ought to be. *State v. Strunk*, 846 P.2d 1297, 1301 (Utah 1993). The Board is in a far better position than a court to monitor a defendant's subsequent behavior and possible progress toward rehabilitation while in prison and to adjust the maximum sentence accordingly.

In this case, the crimes of aggravated kidnapping, rape, and sodomy each carry maximum sentences of life imprisonment. If the minimum mandatory sentences were to run concurrently, the Board of Pardons could make a reasoned decision as to just how long Smith should be incarcerated beyond the fifteen-year minimum mandatory sentence. However, because the trial court ordered the sentences to run consecutively, the Board has no discretion to release defendant, irrespective of his progress, until sixty years have elapsed, which is tantamount to a minimum mandatory life sentence—a sentence that the

---

**9.** The Legislature recently deleted this provision, but that change does not become effective until April 29, 1996. *See* § 76–3–201 Amendment Notes (Supp.1995).

Legislature has only permitted for capital murder. Furthermore, although defendant was convicted of four crimes, it is appropriate to observe that all of them arose out of one criminal episode. While the trial court imposed the greatest minimum mandatory sentences possible under the law, and justifiably so, we think it unreasonable and an abuse of discretion to have imposed essentially a minimum mandatory life sentence and thereby deprive the Board of Pardons of discretion to take into account defendant's future conduct and possible progress toward rehabilitation. *See Strunk,* 846 P.2d at 1302.

We do not mean to imply by this ruling that consecutive sentences are never appropriate. Our ruling is limited to the facts of this case.

The convictions are affirmed, the sentences are vacated, and the matter is remanded for resentencing.

DURHAM, J., concurs in Associate Chief Justice STEWART's opinion.

HOWE, Justice, *concurring and dissenting:*

▆ I concur in the lead opinion except that I dissent from that part upholding the admissibility of statements made by the victim to Keith Brady about thirty-eight hours after the assault. The lead opinion correctly recognizes that "the most difficult issue in determining the admissibility of an excited utterance is whether the statement was uttered with a spontaneity produced by emotional excitement to a degree that provides a warrant of trustworthiness." Further, the lead opinion correctly observes:

> It is not enough, however, to meet the requirements of the [excited utterance] exception that a declarant merely be subject to a degree of aroused emotion produced by the startling event when a hearsay declaration is made.... [A]ttenuated, lingering after-effects of shock, excitement, or fear cannot justify the admission of an out-of-court declaration made long after a startling or traumatic event.

In its analysis of the admissibility of Brady's testimony and its conclusion that the testimony was admissible, the lead opinion is not faithful to the foregoing rules which it espouses. Keith Brady was a detective for the Ogden City Police Department. He had no official part in investigating the crime. He had been a friend of the victim's parents for four years and in that capacity had become acquainted with the victim and her sister. He interviewed the child victim on the Monday morning following the Saturday night assault on her. At that time, she complained of "a little bit" of pain. Brady described her as very distant. "It seemed that she wasn't herself. She wasn't her playful, friendly—you know, usually she would run up and give me hugs when I see her and that." Brady conversed with her for an hour to an hour and a half. He said, "[S]he wouldn't just come out and talk to me. Like I said, she was kind of distant still at this time."

Someone then suggested to Brady that he play a memory game with her. It was a game of cards where the player turns one card over and tries to match it with another card. It was a game that she liked playing. During the playing of this game, Brady was able to ask her numerous questions concerning the assault. Many of the questions were leading. It appears from Brady's testimony that everything the victim stated to him was in response to his questions. It does not appear that she made any spontaneous statement about the event.

In *State v. Thomas,* 777 P.2d 445, 449 (Utah 1989), we held that it was error for the trial court to have allowed a police officer to testify concerning statements made to her by an adult victim of a rape during a one-hour interview conducted one to two hours after the rape. In that case, we wrote:

> In the instant case, not only were the statements made to the officer after significant time delay, but the officer's testimony consisted of repetition of everything which the victim had told her during the one-hour interview. The testimony was not limited to a few statements which might be viewed as being spontaneous or excited utterances. While it is true that the victim was still under the stress and shock of the assault, we believe that we would be pushing the limits of the rule to hold admissible

the entire contents of this one-hour interview as an "excited utterance."

*Id.* This statement applies with equal force here. It is true that the victim here is a child whereas the victim in *Thomas* was an adult. However, the delay of thirty-eight hours here is much longer than the one- to two-hour lapse in *Thomas*. Here, none of the victim's statements to Brady during the hour to hour and a half interview appear to me to have been spontaneous. All of them had to be drawn out of the victim, who was extremely reluctant to talk and only began to open up when playing a card game. The statements were the antithesis of excited utterances.

Although I believe that the admission of Brady's testimony was erroneous, it was a harmless error. Other witnesses and evidence overwhelmingly established the presence of defendant in Corinne that Saturday evening and linked him to the crime of which he was convicted.

ZIMMERMAN, C.J., and RUSSON, J., concur in Justice HOWE's concurring and dissenting opinion.