2026 UT App 89

# THE UTAH COURT OF APPEALS

EMILY S. HOLMES,
Appellant,
*v.*
CATHERINE B. SMITH,
Appellee.

Opinion
No. 20240613-CA
Filed June 4, 2026

Second District Court, Farmington Department
The Honorable Jennifer L. Valencia
No. 210700347

Shaun L Peck and Loren K. Peck,
Attorneys for Appellant

Kumen L. Taylor, Jeffery J. Owens, and
Emily L. Rutter, Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and AMY J. OLIVER
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Emily S. Holmes appeals the jury's verdict in a lawsuit arising from an automobile accident in which she sought damages for economic and noneconomic injuries allegedly caused by Catherine B. Smith. Holmes challenges one jury instruction and several evidentiary rulings. We conclude that Holmes did not preserve her challenge to the jury instruction but that her evidentiary challenges have merit. We therefore reverse the judgment and remand for a new trial.

BACKGROUND

*The Accident*

¶2     The claims in this case arise from an automobile accident that occurred in October 2017 in West Point, Utah. While traveling through a construction zone, Holmes stopped her vehicle, and Smith's vehicle struck it from behind, causing damage to both vehicles.

¶3     At the time of the accident, Holmes, then thirty-six years old, was unaware that she had scoliosis because she had never experienced any symptoms related to the condition. Right after the accident, Holmes was diagnosed with sprain/strain injuries in her cervical and lumbar spine. She received treatment for those injuries from November 2017 through May 2018, followed by a gap until August 2018, when she again sought treatment for pain.

¶4     Holmes filed this action against Smith, alleging that the car accident was due to Smith's negligent operation of her vehicle, that Holmes had suffered injury due to the accident, and that Holmes was entitled to recover the economic and noneconomic damages related to that injury. Smith answered, asserting several affirmative defenses, including that she was "not liable for any injuries claimed by [Holmes] that pre-existed and were not caused by this incident." Smith contended that the treatment beginning in August 2018 differed from the earlier treatment Holmes had received after the accident and was attributable to her pre-existing scoliosis, as well as pre-existing degenerative conditions that affected her spine.

*The Pretrial Motions*

¶5     Prior to trial, the parties filed several motions in limine addressing the admissibility of certain expert testimony and related evidence. Smith moved to exclude the testimony of

Holmes's life care planner, Kourtney Layton. As relevant here, Smith challenged Layton's recommendation for an ergonomic evaluation and the purchase of a VariDesk for Holmes. Smith argued that because Holmes's employer had already provided a VariDesk and there was a high probability that her employer may have completed an ergonomic assessment, there was "no need to provide what [Holmes's] employer [was] already supplying." Smith also argued that Layton's cost calculations were unreliable because (1) despite the fact that the desk had a five-year warranty, Layton claimed that the desk manufacturer recommended replacement every three years and (2) Layton recommended replacing the desk for the next twenty-five years, yet Layton also calculated a work-life expectancy for Holmes of only about fourteen years. Smith also asserted that Layton's cost calculations for vocational rehabilitation counseling were similarly flawed and should be excluded because Layton included amounts for vocational rehabilitation counseling at ages forty-five, fifty, and sixty, despite the fact that according to Layton's calculated work-life expectancy, Holmes would no longer be working at age sixty.

¶6    Holmes opposed the motion, arguing generally that Layton's testimony satisfied the threshold for admissibility under the rules of evidence. As to the VariDesk issue, Holmes argued that her employer providing a desk implicated the collateral source rule and did not make Layton's related testimony inadmissible. Holmes further argued that "all that [was] required for admissibility [was] a threshold showing of the indicia of reliability" and that because Layton's opinions were "supported by facts and data," her testimony was admissible. As to the alleged inconsistencies within Layton's calculations, Holmes asserted that Smith was likely to argue at trial that Holmes's work-life expectancy was longer than the term Layton had calculated, and that if the jury agreed with Smith, additional years of workplace accommodations and vocational rehabilitation counseling would be necessary. Holmes also argued that the

inconsistencies Smith had introduced regarding the warranty and longevity of the VariDesk went "to the weight of [Layton's] testimony and not its admissibility."

¶7 The trial court determined that Layton was qualified to offer expert testimony in life care planning and vocational rehabilitation under rule 702 of the Utah Rules of Evidence. The court nevertheless excluded certain portions of Layton's testimony. First, it excluded testimony regarding an ergonomic evaluation and therapeutic equipment, including the VariDesk. The court relied on the fact that "this issue ha[d] been resolved via the accommodation made by [Holmes's] employer" and concluded, "Allowing [Holmes] to recover damages necessary to purchase something currently being provided to her without cost would result in a fundamentally unfair result." Additionally, the court determined that testimony on these matters should be excluded because there were "inconsistencies and outright contradictions related to the recommendation and other sections of the report related to the work-life expectancy of [Holmes]" that were "of such an egregious nature to render the recommendation unreliable and inadmissible under" rules 702 and 403 of the Utah Rules of Evidence. As to vocational rehabilitation counseling, the court limited Layton's testimony to recommendations consistent with her conclusions regarding Holmes's remaining work-life expectancy, reasoning that without such a limitation, the evidence would confuse the jury.

¶8 Holmes in turn moved to exclude evidence of her pre-existing conditions, arguing that Smith had produced "no expert testimony allocating [Holmes's] current symptoms between or among pre-existing conditions." Smith responded that the report of her expert, Dr. Snook, "was very clear about what conditions were caused by the auto accident and which ones were caused by [Holmes's] pre-existing conditions." The trial court agreed that Dr. Snook's testimony provided "a nonarbitrary basis to determine the extent of harm that was caused by the accident at

issue." And the court suggested that "to the extent that an apportionment instruction [was] ultimately requested at the conclusion of trial," such an instruction would be appropriate.

¶9    Holmes further moved to exclude Dr. Snook's opinion that the collision had been "low speed, low impact." She argued that "even if Dr. Snook looked over the crash photographs or damage estimates, [he was] not qualified to calculate vehicle speeds, and employed no reliable or accepted methodology to do so." Holmes also noted that Dr. Snook had admitted in his deposition that he had no training "in calculating or estimating impact speeds from photographs of accidents," that he was "not a biomechanics person," and that he had no "scientific methodology" for determining impact speed but simply relied on "looking at the photos and having the crash described to" him.

¶10    The trial court denied Holmes's motion. It reasoned, "[Holmes's] own testimony and statements support the inference that it was a 'low speed, low impact' accident, as well as the photos [from] which Dr. Snook observed . . . the minimal damage to both vehicles. Thus, an adequate factual basis exists to support Dr. Snook's conclusion that it was a 'low speed, low impact' accident . . . ." The court further concluded that Dr. Snook's opinion was a general description rather than a technical reconstruction requiring specialized expertise.

*The Trial*

¶11    At trial, Smith focused on Holmes's pre-existing conditions. Smith argued that those conditions, rather than the accident, accounted for the conditions of which Holmes complained after August 2018. Smith's theory was that the accident caused Holmes only temporary injury that "resolve[d] well" within a few months. Smith further argued that the symptoms Holmes experienced beginning approximately three months later were caused by "a completely different condition"

attributable to previously undiagnosed scoliosis and "two degenerative [discs] in her neck."

¶12 Smith sought admission of Holmes's medical records at trial. She did not, however, provide a certification for the records or call a records custodian at trial to provide the foundation required under the business records exception to the hearsay rule. *See* Utah R. Evid. 803(6). Instead, Smith attempted to lay foundation for the admission of the medical records through Holmes's medical expert, Dr. Sonnenberg. Dr. Sonnenberg testified that he had "relied upon" the medical records, that he "assume[d]" the records were electronically stored when they were signed, and that they "appear[ed] to be" made in the regular course of business.

¶13 Holmes objected, arguing that Dr. Sonnenberg's testimony did not satisfy the foundational requirements for admission of the medical records under the business records exception. Holmes thereafter elicited testimony from Dr. Sonnenberg demonstrating his lack of knowledge regarding the creation and maintenance of the records. Dr. Sonnenberg acknowledged that he did not create the records, did not know when the individual entries were made, could not identify who created them, and had no knowledge of the procedures used to compile or store them. He further testified that multiple individuals may contribute to such records and that practices vary across providers. Despite this testimony, the court admitted the medical records. It determined that the foundational requirements for the business records exception had been met because nothing in the records suggested they were not records "of a regularly conducted activity," because Dr. Sonnenberg relied on the records, and because Holmes had previously stipulated to the authenticity of the records.

¶14 The following day, Holmes called Layton to testify. When Holmes's counsel began to question Layton about Holmes's expected work life after the crash, Smith objected, asserting that

such testimony had been excluded by the trial court's prior ruling. Holmes responded that this was "the first time" the methodology and data underlying the work-life calculation "ha[d] ever been addressed," explaining that the prior ruling had excluded certain other testimony as inconsistent with Layton's work-life assessment but that there were no "inconsistencies in the work-life opinion itself." The trial court disagreed, relying on its prior findings of "inconsistencies and outright contradictions" that "render[ed] the recommendations unreliable and inadmissible," and stating that the prior ruling precluded testimony regarding work-life expectancy. Layton was therefore not permitted to offer her opinion on work-life expectancy.

¶15    Later, when Dr. Snook testified, he characterized the collision as "very low impact," consistent with the court's prior ruling permitting such testimony. He based this opinion on his review of photographs of the vehicles and Holmes's deposition testimony. Dr. Snook testified that the photographs showed only minor damage and suggested a low-impact, glancing collision rather than a direct rear-end impact. He further testified that Holmes's description of the accident, including her uncertainty about vehicle movement and her recollection that the occupants were merely "rattled," was not indicative of a high-impact collision.

¶16    At the conclusion of trial, the parties reviewed the jury instructions with the court. The parties' discussion of jury instructions focused on whether the evidence supported an instruction on aggravation of a pre-existing condition. Holmes had submitted a proposed instruction explaining her damage theory: that a plaintiff may recover for aggravation of a pre-existing condition and that the defendant bears the burden to apportion any damages attributable to unaggravated pre-existing conditions. On the final day of trial, however, Smith argued that this instruction should not be given because there was no evidence of aggravation.

¶17　The trial court declined to give Holmes's requested instruction. The court referenced its earlier ruling as to pre-existing conditions and explained, "I was waiting for Dr. Snook's testimony to see if that is how he would testify. His testimony did not appear to me to warrant [this instruction]." The court explained, "We don't have an individual who has a preexisting injury with a doctor who then says, 'It was exacerbated as a result of this injury' and then allocating the percent of fault between the two injuries. We have Dr. Snook's testimony, which is the testimony at issue on this issue, saying that—he testified negatively, that it didn't exacerbate it."

¶18　After some additional discussion, Smith argued as follows:

> The problem with this instruction is it talks about an aggravation of a preexisting condition. They have no evidence to put in front of the jury that there was an aggravation. Dr. Snook is the only one that testified about it. He said, "No, it was not an aggravation. It didn't start until long after the accident."

The court concurred, stating, "That was my feeling as well . . . . I don't know what expert opinion you would have to hang your hat on the preexisting condition." Holmes argued that Dr. Snook's testimony supported giving the instruction, but she did not argue that a separate instruction on burden of proof was required absent evidence of aggravation, nor did she propose a modified instruction omitting the aggravation language.

¶19　The jury returned a verdict finding that Smith was negligent and that her negligence caused injury to Holmes. The jury awarded both economic and noneconomic damages, totaling more than $60,000. Holmes now appeals.

ISSUES AND STANDARDS OF REVIEW

¶20    Holmes first argues that the jury instructions were infirm because they failed to inform the jury that Smith bore the burden of proof on the affirmative defense of pre-existing conditions. Appellate review of jury instructions depends on the nature of the issue presented. "A district court generally has discretion in deciding how it will instruct a jury at trial, as jury instructions require no particular form so long as they accurately convey the law. . . . Jury instruction issues that fall within the district court's discretion will, of course, be subject to an abuse of discretion standard." *State v. Hunt*, 2025 UT 54, ¶ 45, 582 P.3d 772 (quotation simplified). But when a challenge concerns whether the instructions correctly state the law, the issue presents a question of law reviewed for correctness. *See id.* ¶ 46. Because Holmes's claim concerns the legal adequacy of the instructions, we review it for correctness. *See id.*

¶21    Holmes also challenges several of the trial court's evidentiary rulings. She argues that the trial court (1) misapplied the collateral source rule in excluding evidence of accommodations provided by Holmes's employer; (2) admitted Holmes's medical records without a proper foundation under rule 803(6) of the Utah Rules of Evidence; (3) improperly excluded Layton's testimony regarding workplace accommodations, vocational rehabilitation, and work-life expectancy; and (4) improperly allowed Dr. Snook to offer opinions regarding the speed and impact of the collision. Two standards of review apply to these issues. "The first standard of review, correctness, applies to the legal questions underlying the admissibility of evidence." *State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186 (quotation simplified). This includes the question of whether the trial court correctly applied the collateral source rule. *See Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 35, 96 P.3d 893. "The second standard of review, abuse of discretion, applies to the trial court's decision to admit or exclude evidence, to the trial court's

determination that there was a proper foundation for the admission of evidence, and to the trial court's determination regarding the admissibility of expert testimony." *Griffin*, 2016 UT 33, ¶ 14 (quotation simplified).

## ANALYSIS

### I. Jury Instruction Regarding Pre-existing Conditions

¶22 Holmes first argues that the jury instructions were deficient because they did not inform the jury that Smith bore the burden of proof on apportionment related to pre-existing conditions. Holmes contends that she alerted the trial court "that a pre-existing condition instruction was consistent with the evidence and Utah law" but that the court nonetheless "refused to instruct the jury regarding pre-existing conditions, how to properly apportion damages, or who bore the burden to prove an apportionment." We do not read the record quite so broadly.

¶23 As an initial matter, we agree that jury instructions "must inform the jury which party bears the burden of proof on which claims and defenses." *Peterson v. Hyundai Motor Co.*, 2021 UT App 128, ¶ 56, 502 P.3d 320. We also agree that the legal principles reflected in Holmes's proposed instruction are consistent with Utah law. *See* Model Utah Jury Instructions 2d CV2018 (2013), https://legacy.utcourts.gov/muji/?cat=1 [https://perma.cc/425K-QYBE]. But the trial court did not suggest otherwise. The record shows that the court declined to give Holmes's proposed instruction because it agreed with Smith that there was no evidentiary basis for an instruction addressing aggravation of a pre-existing condition, that is, that no evidence had been presented to the jury that the accident may have aggravated Holmes's pre-existing conditions. *See Harris v. ShopKo Stores, Inc.*, 2011 UT App 329, ¶ 15, 263 P.3d 1184 ("All parties are entitled to have their theories of the case submitted to the jury in the court's

instructions, provided there is competent evidence to support them." (quotation simplified)), *aff'd but criticized on other grounds*, 2013 UT 34, 308 P.3d 449. In context, the court's ruling reflects a determination about the sufficiency of the evidence to support the particular instruction proposed by Holmes, not a broader refusal to instruct the jury on pre-existing conditions or burden of proof.

¶24 The broader argument that Holmes now advances on appeal—that the jury instructions were infirm because they failed to instruct the jury as to Smith's burden of proof on pre-existing conditions—was not specifically raised before the trial court. The record does not show that Holmes, either during the discussion regarding the proposed instruction or at any other time, advised the court that the jury should be instructed on the burden of proof as it related to pre-existing conditions generally and that without such instruction, the jury instructions as a whole would be incorrect. Nor did Holmes suggest, as she does on appeal, that the court could simply delete the sentences regarding aggravation and retain the remaining parts of the proposed instruction that were applicable to this case. Because Holmes did not adequately raise this issue before the trial court, the issue has not been properly preserved for appeal, and we do not consider it further. *See Cove at Little Valley Homeowners Ass'n v. Traverse Ridge Special Service Dist.*, 2022 UT 23, ¶ 23, 513 P.3d 658 ("An appellant must properly preserve an issue in the district court before it will be reviewed on appeal. An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it. To provide the court with this opportunity, the issue must be specifically raised and must be supported by evidence and relevant legal authority." (quotation simplified)).

## II. Third-Party Benefits

¶25 Holmes next argues that the trial court erred in excluding evidence of workplace accommodations on the ground that the

issue had already "been resolved via the accommodation made by [her] employer" and that "[a]llowing [Holmes] to recover damages necessary to purchase something currently being provided to her without cost would result in a fundamentally unfair result." Holmes contends that this ruling misapplied the collateral source rule. We agree.

¶26 The collateral source rule "prevents a plaintiff's recovery from being reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source." *Gardner v. Norman*, 2025 UT 47, ¶ 34, 582 P.3d 717 (quotation simplified). The rule reflects the principle that a tortfeasor should not benefit from payments or benefits provided by third parties. *See id.* Thus, even if Holmes's employer provided workplace accommodations at no cost to her, such a benefit does not reduce the damages recoverable from Smith.[1]

¶27 The trial court's concern that Holmes might recover damages for costs she did not personally incur does not justify departure from this rule. "The [collateral source] rule applies even in those cases where it results in a windfall to the plaintiff based on the premise that the plaintiff victim, rather than the defendant tortfeasor, should be the beneficiary of any windfall." *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 37, 96 P.3d 893; *accord Gardner*, 2025 UT 47, ¶ 34. The court therefore erred in excluding the evidence on this basis.

---

1. Furthermore, a conclusion that *all* workplace accommodation costs were "resolved" by the actions of Holmes's employer fails to account for the real possibilities that (1) Holmes may at some point change jobs and begin working for an employer unwilling to provide the same accommodations or (2) Holmes's current employer may at some point cease to provide these accommodations.

¶28 In response, Smith does not defend the trial court's application of the collateral source rule. Instead, she offers alternative grounds for affirmance.

¶29 First, Smith argues that the trial court properly excluded the evidence of workplace accommodations based on the court's alternative reasoning that Layton's recommendations were "unreliable and inadmissible" under rules 702 and 403 of the Utah Rules of Evidence. Specifically, Smith points to Layton's recommendation that a VariDesk be replaced every three years for twenty-five years despite her estimate that Holmes's work-life expectancy was approximately fourteen years, as well as conflicting information regarding the product's warranty.[2] But these points do not render Layton's opinions inadmissible. Differences between replacement intervals, warranty periods, and projected work-life expectancy bear on the weight of the testimony, not its admissibility. These points provide ample opportunity for cross-examination, but they are not a basis for exclusion. Moreover, as discussed below, Layton's inclusion of calculations beyond her estimated work-life expectancy reflects an effort to account for the possibility that the jury might adopt a different work-life figure. *See infra* ¶¶ 40–41. This likewise does not support exclusion.

¶30 Second, Smith contends that the exclusion may alternatively be affirmed because the claimed workplace accommodation damages were not specifically pleaded as special damages under rule 9(h) of the Utah Rules of Civil Procedure. *See generally* Utah R. Civ. P. 9(h) ("If an item of special damage is claimed, it must be specifically stated."). Although we may affirm

---

2. Smith also asserts that the warranty on a VariDesk has now increased to a lifetime warranty. But we do not see how such an after-the-fact change would in any way inform the issue as to whether the court erred when it determined that exclusion here was appropriate, and we therefore do not further address it.

on any ground apparent on the record, *see Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158, that principle does not apply here. The parties dispute whether such damages were required to be pleaded with specificity, and even assuming they were (and we are dubious of this proposition), the record does not support affirmance on that basis.

¶31 Under our rules, trial courts are to freely permit amendments to pleadings when justice requires. *See* Utah R. Civ. P. 15 (providing that a trial court "should freely give permission" to a pretrial amendment of the pleadings "when justice requires" and that even during trial "[t]he court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits"). Here, Holmes disclosed workplace accommodation damages in her initial disclosures, and Smith deposed Layton regarding them. Under these circumstances, any pleading deficiency would not warrant exclusion because the issue of Holmes's damages was disclosed and litigated and the court could have permitted amendment under rule 15 or treated the pleadings as amended to conform to the evidence. *See id.*; *see also Cohn v. J. C. Penney Co.*, 537 P.2d 306, 311 (Utah 1975) (explaining that the sufficiency of pleading special damages turns on whether the defendant was adequately apprised of the claimed damages). The asserted pleading deficiency is therefore not an alternative basis for affirmance apparent on this record.

## III. Holmes's Medical Records

¶32 We next turn to the admission of Holmes's medical records. When medical records are offered "to prove the truth of the matter asserted" therein, the records constitute hearsay. *See* Utah R. Evid. 801(c); *see also Community Ass'n Underwriters of Am., Inc. v. Queensboro Flooring Corp.*, No. 10-CV-01559, 2016 WL 1728381, at *8 (M.D. Pa. Apr. 29, 2016) ("[I]t is clear that hospital

records, being a compilation of written accounts of acts, narrations, and observations of various individuals, which are offered to prove the truth of the matters asserted therein, constitute hearsay."); *Ceaser v. Marshalltown Med. & Surgical Center*, No. 18-2101, 2020 WL 1310299, at *3 (Iowa Ct. App. Mar. 18, 2020) ("Medical records offered to prove the truth of the matters asserted are hearsay."). Such records are therefore admissible at trial only if they fall within an exception to the rule against hearsay. *See* Utah R. Evid. 802. Holmes argues that the trial court erred in admitting her medical records under the business records exception to the hearsay rule because Smith failed to establish the required foundation for their admission.[3] We agree.

---

3. Statements within medical records that originate from a patient can constitute an additional level of hearsay. *See United States v. Blechman*, 657 F.3d 1052, 1065 (10th Cir. 2011) ("Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person. . . . Accordingly, the general rule is that any information provided by an outsider to the business preparing the record must itself fall within a hearsay exception to be admissible." (quotation simplified)); *Ceaser v. Marshalltown Med. & Surgical Center*, No. 18-2101, 2020 WL 1310299, at *3 (Iowa Ct. App. Mar. 18, 2020) (stating that when medical records "include statements allegedly made by others," those statements are "double hearsay" and are "inadmissible unless [they] independently fall[] under one of the recognized exceptions to the hearsay rule" (quotation simplified)). But patient statements recorded by others are generally covered by other established hearsay exceptions. *See* Utah R. Evid. 803(3) (hearsay exception for statements of a declarant's then-existing mental, emotional, or physical condition); *id*. R. 803(4) (hearsay exception for statements a declarant made for medical diagnosis or treatment). Holmes's

(continued…)

¶33    Rule 803(6), the business records exception to the rule against hearsay, permits admission of "[a] record of an act, event, condition, opinion, or diagnosis" only if several conditions are met, including that the record was made at or near the time by someone with knowledge, kept in the course of a regularly conducted activity, and made as part of a regular practice. *See id.* R. 803(6)(A)–(C). Critically, these conditions must be established "by the testimony of the custodian or another qualified witness, or by a certification." *Id.* R. 803(6)(D). Although the trial court was correct that the foundational witness need not be "the custodian of the records," the witness must be qualified to testify that the record was made under the required conditions.

¶34    Here, Dr. Sonnenberg's testimony did not establish the requisite foundation. Dr. Sonnenberg acknowledged that he did not know who created the records, when the individual entries were made, or whether they were created at the time of the events recorded. He further testified that he only "assume[d]" the records were kept in the ordinary course of business and had no knowledge of how the records were stored or if others may have added to them after they were signed. In fact, at one point he stated plainly, "I have no knowledge of this record other than what sits before me, no." Thus, this testimony does not satisfy the requirements of rule 803(6).

¶35    The trial court relied on three considerations in admitting the records: that they appeared to be records of a regularly conducted activity, that Dr. Sonnenberg relied on them, and that Holmes stipulated to their authenticity. But none of these is sufficient for foundation. The business records exception allowing the admission of hearsay does not turn on the apparent regularity of a document; rather, the exception requires either testimony of

---

argument does not concern a second level of hearsay but, instead, focuses simply on the admissibility of the records themselves under the business records exception.

a qualified witness or certification establishing the conditions of rule 803(6). *See id.* And just because Dr. Sonnenberg relied on the records does not mean that he had any specific knowledge of the conditions under which the records were created. *See Belnap v. Graham*, 2016 UT App 14, ¶ 24, 366 P.3d 852 (finding no error in the trial court's determination that an expert's testimony did not meet the requirements of the business records exception where the expert "laid a foundation to testify about what [the medical providers'] regular practices *should have been* (if they followed industry standards) but did not provide a foundation to testify about what [the providers'] practices *actually were*"); *cf.* Utah R. Evid. 703 (providing that an expert's opinions may be based on inadmissible evidence so long as "experts in the particular field would reasonably rely on" that kind of evidence).

¶36 Finally, authenticity is distinct from admissibility under the hearsay exceptions. *See Hansen v. Heath*, 852 P.2d 977, 981 (Utah 1993) (recognizing that the parties stipulated to the authenticity of the medical records, but concluding that the requirements of the business records exception still applied to those medical records), *superseded on other grounds by statute as recognized in Lancer Ins. Co. v. Lake Shore Motor Coach Lines, Inc.*, 2017 UT 8, 391 P.3d 218. Authenticity involves a showing "that the item is what the proponent claims it is," Utah R. Evid. 901(a), whereas the hearsay exceptions focus on testimonial reliability, *see State v. Smith*, 909 P.2d 236, 239 (Utah 1995) ("Exceptions to the hearsay rule are based on factors that provide assurances of testimonial reliability sufficient to dispense with the usual means of purging testimony of error . . . ."). And it is entirely possible for a party to agree that certain records are, indeed, a party's medical records, while at the same time contesting the reliability of those records due to the conditions under which the records were created.

¶37 Because Smith did not present testimony from a qualified witness or certification establishing the requirements of rule

803(6), the trial court exceeded its discretion in admitting the medical records based upon Dr. Sonnenberg's testimony.

### IV. Layton's Opinions Regarding Workplace Accommodations, Vocational Rehabilitation, and Work-Life Expectancy

¶38　Holmes next argues that the trial court erred in excluding Layton's expert opinions regarding workplace accommodations, vocational rehabilitation, and work-life expectancy. She contends that Layton's opinions were not internally inconsistent and that it was appropriate for Layton to provide alternative calculations for the jury to apply to its ultimate determination of Holmes's work-life expectancy. Holmes further argues that the trial court's concern that the evidence would "confuse the jury" did not justify exclusion of the evidence under rule 403 of the Utah Rules of Evidence. We agree as to each point.

¶39　Rule 702 of the Utah Rules of Evidence provides that "[s]cientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." Utah R. Evid. 702(b). The trial court did not identify any deficiencies in Layton's methodology or in the data underlying her opinions. Instead, it excluded portions of her testimony based on perceived inconsistencies within her conclusions, reasoning that those inconsistencies rendered the opinions unreliable.

¶40　We are not persuaded that Layton's opinions were internally inconsistent, much less so inconsistent as to render them inadmissible. The court relied on the fact that Layton calculated a work-life expectancy of approximately fourteen years while also providing cost projections for the VariDesk and the vocational rehabilitation counseling extending beyond those fourteen years. But those projections were presented as

alternative calculations that the jury could apply depending on the work-life expectancy it ultimately found. The various calculations were clearly stated and contained sufficient information that, should the jury decide on a longer work-life projection, it would be able to understand which additional vocational rehabilitation counseling would be required and what the cost of the VariDesk would be for that longer timeframe. Providing such ranges does not undermine reliability; after all, such modeling is common in a life care planning and damages analysis. Rather, providing these ranges reflects a permissible effort to assist the jury in calculating damages under differing factual assumptions.

¶41 Nor was exclusion warranted under rule 403. That rule permits exclusion only when the probative value of the evidence "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* R. 403. The trial court determined that Layton's extended projections "would only serve to confuse the jury." But presenting alternative damages calculations tied to different work-life assumptions does not create a substantial risk of confusing the issues or misleading the jury. Juries are routinely asked to evaluate competing evidence and perform calculations based on alternative scenarios. On this record, the probative value of Layton's testimony was not substantially outweighed by any danger identified in rule 403.

¶42 Smith argues that Holmes waived her challenge, at least as to vocational rehabilitation, by failing to present testimony regarding rehabilitation after the trial court had specifically stated that such testimony would be allowed. We are not persuaded. The trial court initially ruled that Layton could testify regarding vocational rehabilitation "to the extent such recommendations comport with her other employment-related recommendations and conclusions regarding [Holmes's] estimated remaining

working years." But the court later precluded Layton from testifying about Holmes's work-life expectancy altogether. In light of these rulings, Holmes was left with testimony conditioned on a foundation the court had removed. Under these circumstances, Holmes's decision not to present additional testimony does not constitute waiver.

¶43    Accordingly, Holmes did not waive her argument as to vocational rehabilitation and the trial court exceeded its discretion in excluding Layton's expert opinions under both rule 702 and rule 403.

### V. Dr. Snook's Testimony Regarding Speed and Impact

¶44    Finally, Holmes argues that the trial court erred in allowing Dr. Snook to testify that the collision was "low speed, low impact." The court reasoned that there was "an adequate factual basis" for this conclusion and that it was "a relatively general characterization in comparison to conclusions offered by an accident reconstruction expert." Holmes contends that this testimony was improperly admitted under rules 701 and 702 of the Utah Rules of Evidence. We agree.

¶45    "Lay opinion testimony, which is treated under rule 701, is opinion or inference testimony not based on scientific, technical, or other specialized knowledge. Expert testimony, which is treated under rule 702, is opinion or fact testimony based on scientific, technical, or other specialized knowledge."[4] *State v.*

---

4. Lay fact testimony is a third type of testimony, and it need not comply with either rule 701 or rule 702. *See State v. Rothlisberger*, 2006 UT 49, ¶ 16, 147 P.3d 1176. However, such testimony must comply with "rule 602's requirement that a witness have personal knowledge of the matter about which he or she is testifying." *Id.* Because Dr. Snook clearly had no personal knowledge about the

(continued…)

*Rothlisberger*, 2006 UT 49, ¶ 11, 147 P.3d 1176 (footnote omitted). Thus, "any part of a witness's testimony that is based upon scientific, technical, or other specialized knowledge within the scope of rule 702 is governed by the standards of rule 702." *Id.* ¶ 25 (quotation simplified).

¶46 Here, the challenged testimony regarding the speed and impact of the collision was offered by Dr. Snook as an expert and drew conclusions about the nature of the collision based on photographs and Holmes's account of the accident. Indeed, Smith acknowledges that Dr. Snook was not providing lay testimony. The testimony must therefore satisfy rule 702.

¶47 But the trial court did not evaluate the challenged testimony under rule 702, which requires assessing the reliability of "the principles or methods" underlying the expert testimony. Utah R. Evid. 702(b). Instead, the court determined that Dr. Snook's opinions as to collision speed and impact were admissible because they were "a relatively general characterization" and were supported by photographs and Holmes's statements. But that is not the inquiry rule 702 demands. The rule requires a threshold showing that the expert's opinion rests on reliable principles or methods and that those principles have been reliably applied to the facts. *See id.*

¶48 That showing was not made here. Although Dr. Snook is qualified as an orthopedic surgeon, there was no showing that he possesses expertise in accident reconstruction, biomechanics, or any other discipline that would permit him to estimate the speed or impact of a collision based on vehicle photographs or a patient's description of the accident. *See id.* R. 702(a) ("[A] witness who is qualified as an expert by knowledge, skill, experience,

---

speed or impact of the collision, his testimony regarding this issue would also not qualify for admission under this third category of witness testimony.

training, or education may testify in the form of an opinion or otherwise if *the expert's* scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." (emphasis added)). Nor was there any testimony identifying a reliable methodology for drawing such conclusions. Instead, his opinion rested on a visual assessment of vehicle damage and general impressions about the accident.

¶49 To be sure, a medical expert may rely on patient history and other information in forming opinions about diagnosis and causation. But that principle does not extend to offering independent conclusions about the mechanics of a collision without a reliable foundation. Here, the condition of the vehicles and Holmes's recollection of the event did not, without more, provide a reliable basis for expert testimony about the speed or impact of the collision by a medical expert.

¶50 Smith pushes back, arguing that Dr. Snook's conclusions regarding the speed and impact of the collision were supported by the absence of acute injury indicators, such as no emergency treatment after the accident or physical signs of trauma in an exam several days later. But these considerations were not part of the stated basis for the trial court's admission of the testimony. Moreover, also at trial, Dr. Snook's conclusions regarding collision speed and impact continued to be directly tied to the post-accident pictures of the vehicles and to Holmes's deposition testimony, with counsel specifically asking, "And from these photographs, what impressions did you have, if any, as to what type of accident this was in terms of speed or impact?" and, "[W]here [Holmes] testified she doesn't recall whether the car moved forward, . . . is that suggestive of a hard impact based on your experience as an orthopedic surgeon dealing with these type of injuries?" But these are not questions related to medical causation; they ask for opinions about the speed or impact of the collision itself.

¶51   Because the testimony was admitted without the foundational showing required by rule 702, the trial court exceeded its discretion in allowing Dr. Snook to offer opinions regarding the speed and impact of the collision.

CONCLUSION

¶52   Holmes did not preserve her challenge to the jury instructions, so we do not address her related argument on appeal. But we conclude that the trial court erred in multiple respects, including its exclusion of evidence under the collateral source rule, its admission of medical records without a proper foundation under rule 803(6), its exclusion of Layton's expert testimony under rules 702 and 403, and its admission of Dr. Snook's testimony regarding the speed and impact of the collision without the required showing under rule 702. These errors materially affected the presentation of both liability and damages at trial and are reasonably likely to have affected the jury's verdict.[5] We therefore reverse the judgment and remand for a new trial.

––––––––––

5. To sustain a reversal, we must determine that there is a "reasonable likelihood" that error "altered the jury verdict." *State v. Ellis*, 2018 UT 2, ¶ 41, 417 P.3d 86 (quotation simplified). This determination involves a "counterfactual" analysis wherein we consider "an alternative universe in which the trial went off without the error." *Id.* ¶ 42. Given the number and impact of the errors involved here, we are confident there is a reasonable likelihood that the verdict would have been different had the errors not occurred.